GIBSON, DUNN & CRUTCHER LLP
HEATHER RICHARDSON, SBN 246517
    HRichardson@gibsondunn.com
333 South Grand Avenue, Suite 4600
Los Angeles, CA 90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JESSICA VALENZUELA, SBN 220934
    JValenzuela@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301-1744
Tel.: 650.849.5300
Fax: 650.849.5333

ELIZABETH K. MCCLOSKEY, SBN 268184
    EMcCloskey@gibsondunn.com
One Embarcadero Center 2600
San Francisco, CA 94111-3715
Tel.: 415.393.8200
Fax: 415.393.8306

*Attorneys for Plaintiff*
*Alexandra Jackson*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA JACKSON, an individual, | CASE NO. 5:25-cv-01177 |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| SCOTT LEE, an individual; COMFORT INEGBEJE, an individual; OFFICER CORIA, an individual; LIEUTENANT J. BROWN, an individual; OFFICER VALENCIA, an individual; OFFICER HERNANDEZ, an individual; and DOES 1–20, individuals, | |
| Defendants. | |

Plaintiff Alexandra Jackson by and through her counsel files this Complaint against Defendants Dr. Scott Lee, Comfort Inegbeje, Officer Coria, Lieutenant J. Brown, Officer Valencia, Officer Hernandez, and Does 1 through 20, for violation of Ms. Jackson's rights under the First, Eighth, and Fourteenth Amendments of the U.S.

Gibson, Dunn & Crutcher LLP

Constitution, violation of Ms. Jackson's rights under Article I, Sections 1.1 of the California Constitution, sexual battery under Cal. Civ. Code § 1708.5, gender violence under Cal. Civ. Code § 52.4(c)(2), violation of the Tom Bane Civil Rights Act under Cal. Civ. Code § 52.1, violation of the Ralph Civil Rights Act under Cal. Civ. Code § 51.7, professional negligence, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence per se.

## INTRODUCTION

1.    From February to May 2023, Alexandra Jackson was in custody in the California Institution for Women in Chino, California ("CIW") for a non-violent, financial fraud offense.  Ms. Jackson was pregnant with her fourth child during this time. Even though prisons are required by the U.S. Constitution, federal statute, and California state laws to provide adequate medical and prenatal care to pregnant inmates, Ms. Jackson was denied this basic right.  She was deprived of necessary prenatal care and forced to undergo invasive pelvic and breast examinations that served no medical purpose by the only OB/GYN at the facility, Defendant Lee.  Ms. Jackson's repeated requests that she be taken to an outside facility for appropriate treatment were ignored.

2.    On May 17, 2023, Defendants continued to deny Ms. Jackson necessary medical treatment even when she was in active labor.  Even though the California Penal Code required that Ms. Jackson be transported to an offsite hospital immediately, Defendant Lee and others refused to do so.  Instead, Ms. Jackson was left alone in a hallway in the medical area of CIW.  When she was finally provided with a room, the door was left open, and she was left naked from the waist down and visible to all staff and inmates who walked by.  Most troublingly, in an apparent attempt to stall Ms. Jackson's delivery of her child, Defendant Inegbeje physically forced Ms. Jackson's legs closed—which caused Ms. Jackson significant pain and endangered the life of her baby.

3.    When Ms. Jackson was finally transported to an outside hospital—only after Defendant Lee subjected her to another unnecessary and invasive pelvic exam—

correctional staff continued to subject Ms. Jackson to mistreatment. Just hours after she gave birth, correctional officers, including Defendant Coria, shackled Ms. Jackson in direct violation of California Department of Corrections and Rehabilitation ("CDCR") policy and the California Penal Code. Because she was shackled, Ms. Jackson was unable to care for and bond with her newborn baby in the limited time she had before being returned to CIW.

4.     When Ms. Jackson was returned to CIW, she continued to receive disturbingly inadequate medical care. Ms. Jackson was not provided the requisite time to recover from her labor until she made multiple complaints. Moreover, after Ms. Jackson filed medical and administrative grievances regarding the misconduct she was subjected to, staff at CIW, including Defendant Lee, retaliated against her by further denying her critical postnatal treatment. Specifically, Ms. Jackson experienced untreated heavy bleeding and blood clots for the remainder of her incarceration at CIW.

5.     During the time she was incarcerated, Ms. Jackson was totally dependent on the medical staff and other prison employees at CIW for her medical treatment and safety. But at every stage of her pregnancy, including through delivery and recovery, Defendants failed to act as they are required to under the Constitution. As a result, Ms. Jackson suffered serious physical and emotional injuries caused by Defendants' mistreatment that she continues to experience to this day.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over Ms. Jackson's claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Ms. Jackson's claims occurred in the Central District of California.

Gibson, Dunn & Crutcher LLP

## **PARTIES**

8.    Plaintiff Alexandra Jackson is a mother of four who gave birth to her youngest child on May 17, 2023 while in California State custody for a non-violent offense.  Ms. Jackson gave birth to her son in the Triage and Treatment Area ("TTA") in the California Institution for Women ("CIW") in Chino, California.

9.    On information and belief, at all times relevant to the allegations in this complaint, Defendant Scott Lee was a licensed medical doctor who was employed by the California Department of Corrections and Rehabilitation ("CDCR") and/or the State of California as an obstetrician and gynecologist ("OB/GYN") working at CIW.  At all times mentioned herein, Defendant Lee was acting within the course and scope of his employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

10.    On information and belief, at all times relevant to the allegations in this complaint, Defendant Comfort Inegbeje was a registered nurse working at CIW who was employed by the CDCR and/or the State of California.  At all times mentioned herein, Defendant Inegbeje was acting within the course and scope of her employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

11.    On information and belief, at all times relevant to the allegations in this complaint, Defendant Coria was employed by the CDCR and/or the State of California as a correctional officer at CIW.  Defendant Coria's first name is presently unknown. At all times mentioned herein, Defendant Coria was acting within the course and scope of her employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

12.    On information and belief, at all times relevant to the allegations in this complaint, Defendant Valencia is a correctional officer who was employed by the CDCR and/or the State of California working at CIW.  Defendant Valencia's first name is presently unknown.  At all times mentioned herein, Defendant Valencia was acting

Gibson, Dunn &
Crutcher LLP

within the course and scope of her employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

13.     On information and belief, at all times relevant to the allegations in this complaint, Defendant Hernandez is a correctional officer who was employed by the CDCR and/or the State of California working at CIW.  Defendant Hernandez's first name and gender is presently unknown.  At all times mentioned herein, Defendant Hernandez was acting within the course and scope of their employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

14.     On information and belief, at all times relevant to the allegations in this complaint, Defendant J. Brown is a correctional officer who was employed by the CDCR and/or the State of California working at CIW.  Defendant Brown's first name and gender are presently unknown.  At all times mentioned herein, Defendant Brown was acting within the course and scope of their employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

15.     Defendant Does 1–5 are CIW medical staff present during Ms. Jackson's labor and delivery.  On information and belief, at all times relevant to the allegations in this complaint, Defendant Does 1–5 were medical staff employed by the CDCR and/or the State of California working at CIW.  Their names and genders are presently unknown.  At all times mentioned herein, Defendant Does 1–5 were acting within the course and scope of their employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

16.     Defendant Doe 6 is the CIW head registered nurse ("RN"), present for Ms. Jackson's labor and delivery and who interviewed her after she returned to CIW.  On information and belief, at all times relevant to the allegations in this complaint, Defendant Doe 6 was a registered nurse employed by the CDCR and/or the State of

Gibson, Dunn &
Crutcher LLP

5

California working at CIW. His name is presently unknown. At all times mentioned herein, Defendant Doe 6 was acting within the course and scope of his employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

17. Defendant Does 7–11 are CIW medical staff who failed to provide Ms. Jackson with adequate postpartum treatment. On information and belief, at all times relevant to the allegations in this complaint, Defendant Does 7–11 were medical staff employed by the CDCR and/or the State of California working at CIW. Their names and genders are presently unknown. At all times mentioned herein, Defendant Does 7–11 were acting within the course and scope of their employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

18. Defendant Doe 12 is a correctional officer who was assigned to watch Ms. Jackson while she was at Corona Regional Medical Center. On information and belief, at all times relevant to the allegations in this complaint, Defendant Doe 12 was employed by the CDCR and/or the State of California as a correctional officer working at CIW. Their name and gender are presently unknown. At all times mentioned herein, Defendant Doe 12 was acting within the course and scope of their employment, under color and pretense of law, under color of the statutes, ordinances, regulations, policies, practices, and customs of the CDCR.

19. Defendant Does 13–20 are additional medical staff, correctional officers, employees or agents of CIW and CDCR, or other individuals who contributed to and are liable for the misconduct described herein. Their name and gender are presently unknown.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

20. On May 22, 2023, Ms. Jackson submitted an administrative grievance against Defendant Coria, Defendant Hernandez, and Doe 12 for shackling Ms. Jackson while she recovered at CRMC mere hours after giving birth, and for failing to intervene.

6

21.     Between May 20, 2023 and July 16, 2023, Ms. Jackson submitted an administrative medical grievance for the inadequate and abusive care she received from Defendant Lee, Defendant Inegbeje, Defendant Valencia, and Defendant Does 1–6 during her labor and delivery of her son.

22.     Between May 20, 2023 and July 16, 2023, Ms. Jackson submitted an administrative medical grievance for the inadequate postpartum care she received from Defendant Lee, Defendant Inegbeje, and Defendant Does 7–11 in the two months after giving birth.

23.     Between May 20, 2023 and July 16, 2023, Ms. Jackson submitted an administrative grievance regarding Defendant Doe 6's attempt to interfere with Ms. Jackson's use of the grievance process to address Defendant Inegbeje's abusive conduct.

24.     On August 21, 2024, Ms. Jackson submitted an administrative medical grievance against Defendant Lee for sexual misconduct by way of coerced unnecessary pelvic and breast examinations during her prenatal appointments.

25.     On November 15, 2023, Ms. Jackson submitted a Government Claim Form informing the State of her intent to pursue claims against Defendants arising out of her mistreatment by correctional and medical staff at CIW during labor and postpartum recovery at the CRMC.  The state failed to take action in response to Ms. Jackson's claim within 45 days.

26.     On July 12, 2024, Ms. Jackson submitted a second Government Claim Form informing the State of her intent to pursue claims against Defendants arising out of the inadequate postpartum medical care she received at CIW.  On July 18, 2024, Ms. Jackson submitted an amendment to her July 12, 2024 Government Claim, curing a deficiency in the initial submission.

27.     On August 29, 2024, the Department of General Services ("DGS") requested that Ms. Jackson's counsel submit a signed version of the July 12, 2024 Government Claim Form.  Ms. Jackson, through her counsel, again submitted the signed

Government Claim Form via US Mail and email on September 10, 2024.  DGS acknowledged receipt via email on September 19, 2024.  The state failed to respond to Ms. Jackson's claim within 45 days.

## BACKGROUND

**A.    Female Incarceration in the United States.**

28.    Over the past 50 years, the United States increased its incarceration rate more quickly than every other developed democracy.[1]  This dramatic increase in the United States' incarcerated population disproportionately affects people of color and lower-income people.[2]  For example, Black individuals are imprisoned at rates five times higher than those of white individuals.[3]

29.    Today, the United States has the highest rate of incarcerated women in the world.[4]  Women are the fastest growing incarcerated population in the United States.[5]

30.    Women's incarceration has grown at twice the pace of men's incarceration,[6] increasing around 800% between 1978 and 2019.[7]

31.    In 2020 alone, nearly one million women were arrested and almost 153,000 females were incarcerated at any point during the year.[8]  Most of these women are below the age of 45 and are also primary caregivers or mothers to young children.[9]

32.    Because of this significant growth of the United States' prison population, one study noted that several prisons and jails do not have accredited health care

---

[1]  Alexander Testa, Chantal Fahmy, Dylan B. Jackson, Kyle T. Ganson, & Jason M. Nagata, *Incarceration exposure during pregnancy and maternal disability: findings from the Pregnancy Risk Assessment Monitoring System*, BMC PUBLIC HEALTH, Apr. 2022, at 2.
[2] Rebecca J Shlafer, Erica Gerrity, Chauntel Norris, Rachel Freeman-Cook, & Carolyn B Sufrin, *Justice for Incarcerated Moms Act of 2021: Reflections and recommendations*, WOMEN'S HEALTH, Apr. 2022, at 1.
[3] Shlafer, *supra* note 2, at 1.
[4] David H. Cloud, Ilana R. Garcia-Grossman, Andrea Armstrong, & Brie Williams, *Public Health and Prisons: Priorities in the Age of Mass Incarceration*, ANNU REV PUBLIC HEALTH, Apr. 2023 at 10.
[5]  *Mass Incarceration*, ACLU, https://www.aclu.org/issues/smart-justice/mass-incarceration (last visited May 13, 2025).
[6]  Kristen M. Budd, *Incarcerated Women and Girls*, THE SENTENCING PROJECT, (Jul. 24, 2024), https://www.sentencingproject.org/fact-sheet/incarcerated-women-and-girls/.
[7] Shlafer, *supra* note 2, at 1.
[8] Shlafer, *supra* note 2, at 1.
[9] Shlafer, *supra* note 2, at 1.

Gibson, Dunn &
Crutcher LLP

services.[10]   The lack of adequate healthcare in prisons is particularly problematic for women, who are an incredibly vulnerable population.  Many incarcerated women have been victims of violence or sexual assault and require trauma-informed care.[11]

33.    Unsurprisingly, the rapid growth in the female prison population has resulted in a growing population of imprisoned expectant mothers.[12]   An estimated 58,000 pregnant people are admitted to prisons and jails every year.[13]  Stated differently, nearly 4% of incarcerated women in the United States are pregnant while in prison.[14] Because of the racial disparities of the country's prison population, women of color make up a disproportionate number of pregnant incarcerated individuals.[15]

**B.    Challenges Faced by Pregnant Women in Prison.**

34.    In 1967, the Supreme Court recognized that healthcare is a constitutionally protected right for incarcerated people in the case *Estelle v. Gamble*, 429 U.S. 97 (1976).[16]

35.    Incarcerated pregnant women face many challenges in prison, as the United States does not adhere to many internationally recognized standards of care for incarcerated persons and pregnant women.[17]  While prisons are responsible for caring for pregnant women to ensure they have healthy pregnancies, "the right to give birth safely with dignity is not consistently protected for pregnant people behind bars."[18]

36.    Adding to the challenges pregnant women face while giving birth during imprisonment, many are restrained with belly chains, handcuffs, and leg shackles.  But such practice presents serious health risks as the use of restraints on pregnant women increases the risk of falls and injury, placental abruption, poor circulation, and delayed

---

[10] Camille Kramer, Karenna Thomas, Ankita Patil, Crystal M. Hayes, & Carolyn B. Sufrin, *Shackling and pregnancy care policies in US prisons and jails*, 27 MATERNAL & CHILD HEALTH J. 186, 194 (2023).
[11] Kramer, *supra* note 10, at 194.
[12] Testa, *supra* note 1, at 2.
[13] Shlafer, *supra* note 2, at 1.
[14] Kramer, *supra* note 10, at 186–87.
[15] Shlafer, *supra* note 2, at 1.
[16] Kramer, *supra* note 10, at 187.
[17] Cloud, *supra* note 4, at 10.
[18] Kramer, *supra* note 10, at 186–87.

Gibson, Dunn & Crutcher LLP

urgent medical care.[19]  The risks are so serious that the practice of shackling pregnant prisoners is recognized as an international human rights violation.[20]  The United States' report to the U.N. Human Rights Committee in 2011 stated that the Bureau of Prisons "would no longer engage in the practice of shackling pregnant women during transportation, labor and delivery, except in the most extreme circumstances."[21]  Federal Courts that have analyzed this issue have found that the unnecessary shackling of pregnant inmates during childbirth violates the Eighth Amendment's prohibition on cruel and unusual punishment.[22]

37.    While proponents of shackling argue that their use reduces the risk of assault or escape by incarcerated women, they fail to account for the substantially reduced risk of such behavior due to the physical condition of pregnancy.[23]

38.    The federal government, the District of Columbia, and at least 39 states— including California—have passed legislation banning the use of restraints during labor and delivery.[24]

39.    Yet even in jurisdictions with specific anti-shackling legislation, women continue to be shackled.  Such laws often allow for the use of restraints if a legitimate

---

[19] Kramer, *supra* note 10, at 191.

[20] *See* United Nations Human Rights, *International Covenant on Civil and Political Rights*, art. 10, Dec. 16, 1966, 999 U.N.T.S. 171; *International Covenant on Economic, Social and Cultural Rights*, art. 12(1), Dec. 16, 1966, 993 U.N.T.S. 3, 6 I.L.M 360; Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, UN Doc A/RES/39/46 (Dec 10, 1984),    https://www.ohchr.org/en/instruments-mechanisms/instruments/convention-against-torture-and-other-cruel-inhuman-or-degrading.

[21] UN Human Rights Committee, *Consideration of reports submitted by States parties under article 40 of the Covenant, Fourth periodic report: United States of America*, ¶ 231, UN Doc CCPR/C/USA/4 (May 22, 2012), http://www.refworld.org/docid/5146fe622.html.

[22] *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1219 (W.D. Wash. 2010); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 533 (8th Cir. 2009); *Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 93 F.3d 910, 916 (D.C. Cir. 1996) (citing *Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 877 F. Supp. 634, 668–69 (D.D.C. 1994), *vacated in part, modified in part*, 899 F. Supp. 659 (D.D.C. 1995)).  Academic sources have mirrored these courts' conclusion.  Int'l Human Rights Clinic, et al., THE SHACKLING OF INCARCERATED PREGNANT WOMEN: A HUMAN RIGHTS VIOLATION COMMITTED REGULARLY IN THE UNITED STATES, 9 (2014) *available at* https://chicagounbound.uchicago.edu/ihrc/3/.

[23] Kramer, *supra* note 10, at 187.

[24] Kramer, *supra* note 10, at 187.

Gibson, Dunn & Crutcher LLP

safety threat exists, is known to result in to abuses of such discretion resulting in shackling of pregnant women when no threat exists.[25]

40.    The challenges faced by incarcerated women do not end after giving birth. For example, many women in prison also face immense trauma from being separated from their newborns.  Prisons continue to remove newborns from their mothers' care despite "growing evidence to show an increase in mental ill-health in all women compulsorily separated from their babies."[26]  This separation exacerbates the risk of self-harm and suicide for imprisoned women.[27]   Research shows that mothers forced to separate from their newborn babies also experience a loss of identity and disenfranchised grief.[28]  In fact, even the mere "anticipation of separation of an imprisoned mother from her newborn baby elicits feelings of loss."[29]

## CALIFORNIA STATUTES AND REGULATIONS REGARDING PREGNANCY IN PRISON

41.    Acknowledging the duty it has to protect this extremely vulnerable population, California has enacted numerous statutes and regulations designed to specifically address the myriad difficulties incarcerated pregnant persons and new mothers face.

42.    California statutes, regulations, and correctional policies, including the California Penal Code, the CDCR Operations Manual, and the CDCR California Correctional Health Care Services ("CCHCS") Health Care Department Operations Manual ("Health Care Manual"), outline the affirmative prenatal and postnatal rights of incarcerated individuals and establish strict guidelines as to how prison employees must act to protect this vulnerable prison population.

---

[25] Kramer, *supra* note 10, at 187, 189.
[26] Laura Abbott, *Birth supporters experiences of attending prisoners being compulsorily separated from their new-born babies*, Int'l J. Health Promotion & Educ., May 2023, at 1.
[27] Abbott, *supra* note 26, at 1.
[28] Abbott, *supra* note 26, at 2.
[29] Abbott, *supra* note 26, at 2.

Gibson, Dunn & Crutcher LLP

**A.      Pregnant Incarcerated Individuals Have Affirmative Rights Regarding Labor and Delivery Under the California Penal Code and Corresponding Correctional Policies.**

43.     Under the California Penal Code, an incarcerated pregnant person "in labor *or presumed to be in labor* shall be treated as an emergency and shall be transported to the outside facility."  Cal. Penal Code § 4023.8(l) (emphasis added).

44.     The Health Care Manual similarly states that labor "shall be treated as an emergency" and that an inmate in labor shall "be transported *immediately* via ambulance" to an appropriate offsite location for delivery.  Health Care Manual, at 3.1.16(e)(5)(A) (emphasis added); *accord* CDCR Operations Manual, at 54045.6.

45.     Further, the Health Care Manual allows for onsite delivery at a correctional institution only "[i]n *emergent circumstances* where the patient *cannot* be transported offsite prior to delivery of a baby."  Health Care Manual at 3.1.16(e)(4)(A) (emphasis added).

46.     Additionally, an incarcerated pregnant person must "be given the maximum level of privacy possible during the labor and delivery process."  Cal. Penal Code § 4023.8(o).  Both the California Penal Code and the CDCR Operations Manual require any prison guard present to be "stationed outside the room rather than in the room absent extraordinary circumstances."  Cal. Penal Code § 4023.8(o).  The California Penal Code further provides that, "[i]f a guard must be present in the room, the guard shall stand in a place that grants as much privacy as possible during labor and delivery."  Cal. Penal Code § 4023.8(o).

**B.      Pregnant Incarcerated Individuals May Not be Shackled During Labor and Recovery Absent Extraordinary Circumstances.**

47.     Pregnant, laboring, and postpartum incarcerated individuals are especially protected from physical restraints.  Specifically, "**[n]o leg restraints or waist chains shall be applied to pregnant offenders.**  In every instance, special effort shall be made

to avoid harm to the unborn child." CDCR Operations Manual, at 54045.11 (emphasis in original).

48. Indeed, as the California Penal Code makes perfectly clear, "[a] pregnant inmate in labor, during delivery, or in recovery after delivery, shall not be restrained by the wrists, ankles, or both, unless deemed necessary for the safety and security of the inmate, the staff, or the public." Cal. Penal Code § 3407(b); *see also* CDCR Operations Manual, at 54045.11.

49. Restraints may only be placed on a pregnant incarcerated person if it is "deemed necessary for the safety and security of the inmate, the staff, or the public." Cal. Penal Code § 3407(b); *see also* Health Care Manual at 3.1.16(e)(5)(B) (stating that the use of restraints in emergency transport shall be in accordance with the California Penal Code); CDCR Operations Manual, at 54045.11 (limiting the use of restraints to physical safety threats, substantial property damage threats, or attempted escape).

50. Even when restraints may be used, if the medical professional responsible for the incarcerated person's care "determines that the removal of restraints is medically necessary," the restraints *must* be removed. Cal. Penal Code § 3407(c). Indeed, mechanical restraints, meaning devices used to restrict a person's movement, cannot be used "unless circumstances exist that *require* the immediate application of mechanical restraints to avoid the *imminent threat* of death, escape, or great bodily injury." CDCR Operations Manual, at 51020.6(c) (emphasis added). Even then, "mechanical restraints may be used *only* for the period during which such threat exists." *Id.*

**C.    Incarcerated Individuals Have Rights to Postpartum Care.**

51. The California Penal Code and CDCR policies unequivocally bestow upon incarcerated individuals the right to postpartum care after giving birth.

52. The California Penal Code requires that individuals who just gave birth be examined by a "physician, nurse practitioner, certified nurse midwife, or physician assistant . . . within one week from childbirth and as needed for up to 12 weeks postpartum." Cal. Penal Code § 3408(p). The examining medical professional "shall

determine whether the incarcerated person may be cleared for full duty or if medical restrictions are warranted." *Id.* "Full duty" generally refers to a status where an incarcerated individual is able to participate in all activities and programs within the facility without any medical or other restrictions. In other words, they are cleared to resume normal activities such as work assignments, educational programs, recreation, and other activities. Incarcerated individuals with medical conditions or injuries may be placed on "modified duty" or "off duty" with restrictions on their activities. This modified duty is sometimes referred to as a "medical lay-in." *See* Health Care Manual, at 3.3.6.5.

53.    In any event, "[p]ostpartum individuals *shall be* given at least 12 weeks of recovery after any childbirth before they are required to resume normal activity." Cal. Penal Code § 4023.8(p) (emphasis added); Health Care Manual, at 3.1.16(e)(6)(D).

54.    The Health Care Manual requires that nurses stationed in the triage and treatment area ("TTA") initiate postpartum care following vaginal births, requires CCHCS staff to "schedule follow-up appointments, articulate treatment plans, and determine the need for continued limited duty," and requires that nurses refer the individual for mental health care under certain circumstances. Health Care Manual, at 3.1.16(e)(6)(B)-(D).

55.    Postpartum incarcerated individuals have a right to necessary menstrual products. The Penal Code provides that incarcerated persons "shall, upon request, have access to, and be allowed to use, materials necessary for personal hygiene with regard to their . . . reproductive system . . . at no cost to the incarcerated person." Cal. Penal Code § 3409(a).

## FACTUAL ALLEGATIONS

### A.    Ms. Jackson's Incarceration Begins Just Days After She Learns That She Is Pregnant.

56.    In the fall of 2022, Ms. Jackson and her three children were living in San Diego close to her children's school and their father's family. Ms. Jackson was no

Gibson, Dunn & Crutcher LLP

longer in a relationship with her children's father and had begun a relationship with Kevin Dean Jr., with whom she is currently engaged to be married.

57.    On August 29, 2022, Ms. Jackson learned from her doctor that she was pregnant with her fourth child.  Ms. Jackson and Mr. Dean were excited at the prospect of having their first child together and starting their family.

58.    Just four days later, on September 2, Ms. Jackson and Mr. Dean were driving near the beach when a police officer pulled them over.  During the stop, the officer detained Ms. Jackson and took her into custody for an alleged probation violation.  Though she did not know it at the time, Ms. Jackson would be in custody the remainder of her pregnancy.

59.    Ms. Jackson was indicted in the Southern District of California on a number of non-violent financial fraud charges.  On September 21, 2023, Ms. Jackson entered into a plea agreement through which she pled guilty to one count of conspiracy and was sentenced to 31 months in prison.

60.    After a brief detention at a municipal police station, Ms. Jackson was transferred to Las Colinas Detention Facility in Santee, California, where she remained for several months.  During her time at Las Colinas, Ms. Jackson was transported to UC San Diego Medical Center ("UCSD") to receive prenatal care.

61.    The OB/GYN at UCSD made Ms. Jackson feel comfortable and well-cared-for.  The doctor was very engaged during Ms. Jackson's visits and was diligent in ensuring that Ms. Jackson received all necessary accommodations from the Las Colinas facility, including a special diet and an extra body pillow.

62.    When Ms. Jackson received care at UCSD, a nurse was always present when the doctor performed any kind of physical examination.  The care Ms. Jackson received at UCSD was consistent with the care she received during her three prior pregnancies, when she was not in custody.

Gibson, Dunn &
Crutcher LLP

63.     In mid-January 2023, when Ms. Jackson was around five months pregnant, she was transferred to the Central California Women's Facility ("CCWF") in Chowchilla, where she was held for three weeks.

64.     While at CCWF Ms. Jackson received prenatal care from a doctor at the facility.  Ms. Jackson again found the doctor to be caring and professional.  Ms. Jackson felt that the doctor took deliberate steps to make her feel comfortable, including seeking her consent before performing any care that required physical touch.

65.     The doctor at CCWF never asked to give Ms. Jackson a pelvic exam, nor did he suggest one was necessary.

**B.     Ms. Jackson Is Abused by Defendant Lee During Prenatal Appointments at CIW.**

66.     On February 6, 2023, Ms. Jackson was transferred to CIW.  At the time she was transferred, Ms. Jackson was in her second trimester of pregnancy.

67.     On information and belief, the CDCR employed only one OB/GYN at CIW during the time Ms. Jackson was housed there—Defendant Lee.  On information and belief—and unknown to Ms. Jackson at the time—Defendant Lee has a long history of abusing his position at CIW to sexually assault and mistreat his vulnerable patients under the guise of providing gynecological care.

68.     Soon after her arrival at the facility, Ms. Jackson was scheduled for an intake appointment with Defendant Lee, the only doctor available at CIW to provide OB/GYN care.

69.     From the very first time Ms. Jackson interacted with Defendant Lee, she noticed that Dr. Lee's behavior was drastically different than she had ever experienced while getting OB/GYN care.  During the initial intake appointment, Ms. Jackson observed that Defendant Lee seemed irritated about providing her care.  Defendant Lee made comments to Ms. Jackson about how women in prison should not be having babies and suggested it would be easier if she just got an abortion.

Gibson, Dunn & Crutcher LLP

70.    While a nurse was initially present during her intake appointment, at one point during the examination, the nurse left the room, leaving Ms. Jackson alone with Defendant Lee.

71.    Once the nurse left the room, Defendant Lee requested that Ms. Jackson submit to a pelvic examination.  Ms. Jackson declined, explaining that she had not received regular pelvic exams during her first three pregnancies.  During this appointment, Defendant Lee did not perform a pelvic examination.

72.    Ms. Jackson continued to have regular prenatal appointments with Defendant Lee.

73.    Ms. Jackson observed that Defendant Lee's behavior was different when other staff was present.  For example, Ms. Jackson noted that he appeared to be nervous around other medical staff and that his hands shook when other staff was present. Defendant Lee seemed withdrawn and neglected to actively participate in Ms. Jackson's appointments around other staff.

74.    Though a nurse was always present at the beginning of Ms. Jackson's appointments, Defendant Lee almost always found a reason to send the nurse out of the room.

75.    Without fail, once Defendant Lee was alone with Ms. Jackson, he would pressure her to submit to a pelvic examination.  In stark contrast to his otherwise disinterested demeanor, Ms. Jackson noticed that Defendant Lee became animated and enthusiastic when asking to perform pelvic examinations, as if he was getting sexual gratification.

76.    As Ms. Jackson's pregnancy progressed, Defendant Lee's demands for intrusive physical examinations became more persistent.  From April 2023 through the end of Ms. Jackson's pregnancy, Defendant Lee routinely isolated Ms. Jackson during her appointments and insisted on examining her cervix, asking her multiple times throughout each appointment.

Gibson, Dunn & Crutcher LLP

17

77.    When Ms. Jackson expressed doubt that the invasive examinations were necessary, Defendant Lee would insinuate that Ms. Jackson was putting her baby at risk by not allowing him to perform pelvic examinations, suggesting to Ms. Jackson that she "must not care about your baby."

78.    Notably, there was no indication that Ms. Jackson's pregnancy faced complications that necessitated a pelvic examination to ensure the safety of her baby.

79.    On at least two occasions before her delivery, and despite her protests that further pelvic examinations were unnecessary, Ms. Jackson felt like she had no choice but to allow Defendant Lee to perform pelvic examinations and so she assented in the face of extreme coercion, even though she did not want to undergo the examinations. Ms. Jackson observed that Defendant Lee performed the pelvic examinations with unusual and unprofessional enthusiasm, as if he were deriving sexual gratification from the procedure.  She also observed that the pelvic examinations took much longer than those she had undergone in the past that were performed by other physicians. Ms. Jackson also noticed that, during those examinations, Defendant Lee caressed her stomach, which surprised Ms. Jackson because she had not experienced this behavior from other physicians during pelvic exams.

80.    Beginning in late April, Defendant Lee also requested to examine Ms. Jackson's breasts, telling her that the exam was necessary to her prenatal care.  When she declined his request, Defendant Lee again attempted to shame Ms. Jackson in an effort to coerce her to submit to the exam by commenting that she did not care about her child's health.

81.    On at least one occasion, Ms. Jackson permitted Defendant Lee to conduct what Defendant Lee told her was a medically necessary breast examination, despite her discomfort with the procedure.  She only did so because Defendant Lee told her she was required to submit to the exam to avoid endangering her unborn son.

82.    On multiple occasions, Ms. Jackson declined to attend her appointments scheduled with Defendant Lee because she was uncomfortable being treated by him.

Gibson, Dunn & Crutcher LLP

Each time Ms. Jackson refused a visit with Defendant Lee, she completed a refusal form indicating her discomfort with his behavior.  In addition to completing the refusal forms, Ms. Jackson told other medical staff at CIW that she was uncomfortable being treated by Defendant Lee.  Ms. Jackson pleaded that she be allowed to see another physician at an outside medical facility, noting that she had personal medical insurance that could cover the costs.  Despite her pleas, the medical staff at CIW told her it was impossible for her to be seen by an outside physician.  One nurse Ms. Jackson spoke with agreed that Defendant Lee was off-putting, but said Ms. Jackson would have to continue to see Defendant Lee as he was the only OB/GYN at the facility.

83.    On multiple occasions, Ms. Jackson told Defendant Lee that she was not comfortable being examined by him and that if she needed a pelvic examination, she would like to be referred to an outside medical provider for that examination.  Defendant Lee refused to refer Ms. Jackson to receive care outside the facility, insisting that he was her only option.

84.    CIW scheduled Ms. Jackson to be induced into labor on May 13, 2025.  Ms. Jackson refused the induction.  Rather than respect Ms. Jackson's decisions, CIW rescheduled the induction for May 18, 2025.

**C.    Ms. Jackson Goes into Labor at CIW And Is Given Grossly Inadequate Care.**

85.    On May 17, 2023, at approximately 2:00 p.m., Ms. Jackson began to experience contractions.  Recognizing that she was in labor, Ms. Jackson immediately notified Defendant Valencia, the CIW correctional officer on duty at her housing unit.

86.    Ms. Jackson believed that Defendant Valencia would treat her labor as a medical emergency and that she would be taken immediately to the hospital as required. Instead of transporting Ms. Jackson to the hospital immediately, however, Defendant Valenica arranged for Ms. Jackson to be transported via ambulance to the on-site Triage and Treatment Area ("TTA") at CIW where she was left in the care of CIW's on-site medical staff, Defendant Does 1–6, Defendant Inegbeje, and Defendant Lee.

Gibson, Dunn & Crutcher LLP

87.    Ms. Jackson arrived at the on-site TTA at approximately 3:04 p.m.  Once there, Ms. Jackson was placed on a gurney in the hallway.

88.    During this time, Ms. Jackson was left alone in the hallway while she continued to have contractions.  While she was alone on the gurney, Ms. Jackson felt her water break.  Recognizing the seriousness of the situation, Ms. Jackson screamed for help, at which point Defendant Inegbeje came over and moved Ms. Jackson from the hallway into an open room.

89.    Throughout the time she was in TTA at CIW, Ms. Jackson was not afforded privacy.  She was moved to a room, but the room's windows were open to public view.  CIW's on-site medical staff, including Defendant Does 1–6, Defendant Inegbeje, and Defendant Lee, observed Ms. Jackson was undressed, but none of them provided her with a gown or curtain.  As a result, inmates and CIW staff who walked by could easily see her naked from the waist down and actively giving birth.

90.    As her labor progressed, Ms. Jackson repeatedly asked Defendant Does 1–6 and Defendant Inegbeje to call an ambulance to take her to the hospital, but they repeatedly denied her request.  Defendant Inegbeje explained to Ms. Jackson that Defendant Lee had specifically instructed her not to call for an ambulance until Defendant Lee could examine Ms. Jackson.  As a result, Defendant Inegbeje refused Ms. Jackson's request to be transported to the hospital.

91.    Left alone in her room, Ms. Jackson continued waiting for appropriate medical care.  Throughout this time, Ms. Jackson experienced intense labor pains and shouted for help.  Her contractions increased in intensity and frequency, happening about two minutes apart, but Defendant Lee had not yet arrived to TTA.

**D.    Defendant Lee Refuses to Call an Ambulance Until Ms. Jackson Submits to an Unnecessary Cervical Examination.**

92.    Defendant Lee did not arrive at the TTA until approximately 3:45 p.m.—nearly two hours after Ms. Jackson first reported she was going into labor.

93.    When he finally arrived, Defendant Lee told Ms. Jackson that he would not call an ambulance unless she allowed him to examine her cervix.  Defendant Lee stated that he needed to perform the examination to determine which hospital he would send Ms. Jackson.  Defendant Lee also told her that his decision as to which hospital to send her would impact how much time she would be able to spend with her baby after his birth.

94.    Based on her prior interactions with Defendant Lee, Ms. Jackson was not comfortable having him perform a cervical examination.  Further, based on her prior three childbirth experiences, Ms. Jackson believed the examination was unnecessary and was concerned that the examination could cause her labor to progress more rapidly.

95.    Nonetheless, because she was experiencing painful contractions and was desperate to get to a hospital, Ms. Jackson felt compelled against her will to submit to the cervical examination.  She believed that an ambulance would not be called to transport her to the hospital unless she agreed.  As a result, Ms. Jackson submitted to the procedure under duress and not willingly.

96.    Defendant Lee then performed the cervical examination and determined that Ms. Jackson was five centimeters dilated.

97.    Even though Defendant Lee told Ms. Jackson that the examination was necessary so he could decide what hospital she should go to, after he completed the examination, Defendant Lee admitted that it was not his decision which hospital Ms. Jackson would be taken to.  Rather, he told Ms. Jackson that the decision would be made by the EMTs.

98.    At that moment, Ms. Jackson realized that Defendant Lee had deceived her into submitting to yet another unwanted and unnecessary pelvic examination.

99.    After Defendant Lee had performed the unnecessary exam, he allowed medical staff to call for an ambulance at approximately 3:48 p.m.

Gibson, Dunn &
Crutcher LLP

**E.    CIW Medical Staff Interfere with Ms. Jackson's Delivery, Causing Her Significant Pain.**

100.    After the unwanted cervical examination, while she was still at CIW, Ms. Jackson's labor rapidly intensified just as she had feared.  Approximately five minutes after the exam, Ms. Jackson told Defendant Inegbeje that she felt the baby coming, and she needed to push.

101.    Rather than assist with delivery, Defendant Inegbeje told Ms. Jackson, "No, don't push!"  Defendant Inegbeje then placed her hands on Ms. Jackson's legs and forcefully pushed them closed, causing Ms. Jackson to experience immense pain.  Ms. Jackson yelled that Defendant Inegbeje was hurting her and asked that she let go of Ms. Jackson's legs.  In response, Defendant Inegbeje got upset and left the room.

102.    Shortly thereafter, Defendant Inegbeje came back into the room and again told Ms. Jackson to wait to push and attempted to forcefully close Ms. Jackson's legs for a second time.  Ms. Jackson again yelled for Defendant Inegbeje to stop.  Defendant Inegbeje's actions placed Ms. Jackson and her baby at risk of serious medical harm.

103.    Despite Defendant Inegbeje's efforts to stall the labor process, Ms. Jackson's delivery progressed quickly.  As Ms. Jackson was delivering her baby, Defendant Lee stood directly outside the room shouting at medical staff to let him know when they saw the baby's head.  Ms. Jackson noticed that although Defendant Lee was directly outside her room shouting orders, he had seemingly been avoiding looking at her.  It wasn't until Ms. Jackson's baby was crowning, that Defendant Lee reentered the room.

104.    After a few pushes, Ms. Jackson delivered her baby while she was still at CIW.  The delivery took place at approximately 4:07 p.m., over two hours after Ms. Jackson first reported to CIW staff that she was in labor.  Throughout this time, while Ms. Jackson was awaiting transfer to an appropriate medical facility, Ms. Jackson was denied access to medical care that would help alleviate pain, including an epidural.

Gibson, Dunn &
Crutcher LLP

105.   When the baby was first born, his skin was blue and he was not breathing. The CIW medical staff, including Defendant Lee, Defendant Inegbeje, and Defendant Does 1–6, could clearly see that Ms. Jackson's newborn baby was in distress and in need of medical aid.  However, none provided any aid.

106.   Luckily, the EMTs arrived just as Ms. Jackson delivered her baby and they provided her baby with medical care, including oxygen.

**F.    Ms. Jackson Is Taken to the Hospital and Unlawfully Placed in Leg Restraints.**

107.   After giving birth, Ms. Jackson and her newborn were transported via ambulance to Corona Regional Medical Center ("CRMC").  Defendant Hernandez accompanied Ms. Jackson in the ambulance to CRMC.

108.   Shortly after Ms. Jackson arrived at CRMC, Defendant Coria arrived. Ms. Jackson had never previously met or interacted with Defendant Coria.

109.   Defendant Coria watched as the nurses at CRMC attended to Ms. Jackson's baby.  Defendant Coria then asked the nurses if she could hold Ms. Jackson's baby.  Ms. Jackson overheard the conversation and told Defendant Coria no, that Defendant Coria did not have permission to hold her baby.  At that point, Ms. Jackson herself had not even been allowed to hold her own baby.

110.   After Ms. Jackson denied Defendant Coria's request to hold her baby, Defendant Coria's demeanor immediately changed, and she became rude to Ms. Jackson.

111.   Shortly thereafter, Defendant Coria informed the medical staff at CRMC that Ms. Jackson needed to be placed in leg restraints and that the restraints should have been placed on Ms. Jackson as soon as she had given birth.

112.   Ms. Jackson tried to explain to Defendant Coria that it was against state and CDCR policy to place her in leg restraints while she was recovering from labor and delivery.  But Defendant Coria insisted that she knew better and told Ms. Jackson that she had given her enough time without the restraints.

113.   At around 8:00 p.m. on May 17—just hours after she gave birth—Defendant Coria shackled Ms. Jackson's legs together using metal leg restraints and secured the leg restraints to the hospital bed.  Defendant Coria had no good-faith basis to do so.  Accordingly, as Defendant Coria shackled Ms. Jackson in violation of CDCR policy and the Penal Code, Defendant Coria used excessive and unnecessary force.

114.   On information and belief, Defendant Hernandez was present when Defendant Coria unlawfully shackled Ms. Jackson and did nothing to prevent Defendant Coria's actions.

115.   Even after shackling Ms. Jackson, severely limiting her mobility, Defendant Coria still refused to give Ms. Jackson any privacy while she was in the hospital.

116.   Ms. Jackson was kept in shackles during post-delivery medical examinations and while nurses were attempting to change Ms. Jackson's dressings. When Ms. Jackson went to remove her underwear so that she could change her dressing, Defendant Coria removed one shackle at a time, reattaching it before removing the second one, while Ms. Jackson changed.   Defendant Coria even accompanied Ms. Jackson to the restroom and kept her in shackles while Ms. Jackson was using the restroom.

117.   During a significant amount of the time Ms. Jackson was with her newborn in the hospital, she remained in leg restraints.  As a result, she was confined to her hospital bed and unable to properly care for her baby.  The metal leg restraints significantly limited Ms. Jackson's ability to interact and bond with her newborn baby. Ms. Jackson could not walk around to soothe him, bathe him, change his diaper, or place him in the bassinet without asking for assistance.

118.   At one point during her three-day hospital stay, Ms. Jackson was forced to walk down the hallway to another hospital room with her legs in shackles while pushing her baby in an incubator.  The heavy metal shackles dug into Ms. Jackson's ankles, causing her to trip multiple times.  Fearing that she would trip and knock over her baby,

Ms. Jackson stopped repeatedly to adjust the shackles so that she would not fall.  Other hospital patients and visitors stared at Ms. Jackson, causing her severe emotional distress.

119.   Ms. Jackson remained shackled throughout the night, while multiple officers watched over her, including Defendant Hernandez, Defendant Coria, and Defendant Doe 12.   None of the officers who observed Ms. Jackson in shackles intervened.

120.   Ms. Jackson's shackles were finally removed around 10:00 a.m. on May 18, 2023.

121.   The correctional officer who removed the shackles told Ms. Jackson he could not believe that the shackles had not been removed earlier.  He looked through Ms. Jackson's paperwork and could not find any explanation for why she was shackled.  Ms. Jackson was not a high security risk and did not have a history of violence.  He told Ms. Jackson that she should never have been shackled to begin with.

122.   Despite Ms. Jackson's history as low risk, on May 17, 2023, Defendant Brown signed an Inmate Transport and Guarding Assessment authorizing that Ms. Jackson be kept under direct supervision and in full mechanical restraints at all times, including handcuffs, waist chains, and leg irons.

123.   Ms. Jackson observed another inmate in the room next to her who had also just given birth too.  Unlike Ms. Jackson, the other inmate was never placed in shackles.

124.   Later during her hospital stay, another correctional officer requested to hold Ms. Jackson's newborn baby.  Ms. Jackson was distressed by the request and did not want the correctional officer to hold her baby.  But she was fearful that if she failed to comply with the request to hold her baby, this correctional officer would react the same way as Defendant Coria did earlier and again place her in leg restraints.

125.   Due to concerns that she would be subject to physical restraints if she disagreed, Ms. Jackson complied with the correctional officer's request to hold her baby.

Gibson, Dunn &
Crutcher LLP

126.  While at CRMC, Ms. Jackson was treated for heavy bleeding and blood clots, and was provided prescription medication and sanitary supplies to address the heavy bleeding.

127.  On May 20, 2023, at approximately 2:00 p.m., Ms. Jackson was transported from CRMC back to CIW.  Her baby was discharged into the care of his father.

128.  As a result of the way she was treated during her hospital stay, Ms. Jackson suffers severe emotional trauma and has been diagnosed with post-traumatic stress disorder.

**G.    Ms. Jackson Receives Inadequate Postpartum Care After Returning to CIW.**

129.  Upon returning to CIW, Ms. Jackson was seen in CIW's medical facility for a postpartum checkup at which Defendant Inegbeje was present.

130.  At this initial checkup, Defendant Inegbeje told Ms. Jackson she could not have an electric breast pump, and Ms. Jackson was never provided one for the duration of her time at CIW.  At a later date, Ms. Jackson met with a social worker who told Ms. Jackson she was not allowed to have an electric breast pump because she was not in the breast-feeding program.  The breast-feeding program requires inmates to have an approved visitor.  However, Ms. Jackson was not made aware of this requirement prior to giving birth, which prevented her participation.  Because Ms. Jackson was scheduled to be transferred from CIW in July 2023, Ms. Jackson believed that there was insufficient time to complete the process of getting an approved visitor.

131.  When Ms. Jackson returned from the hospital on May 20, 2023, CIW had not provided Ms. Jackson a "medical lay-in"—excused time off from work assignments and programming—even though postpartum individuals are required to have at least 12 weeks of recovery after childbirth before resuming normal activities.  *See* Health Care Manual, at 3.3.6.5; California Penal Code § 4023.8(p).  Rather than allow Ms. Jackson necessary postpartum recovery time, CIW scheduled Ms. Jackson to return to normal activities, such as attending general education development (GED) classes on May 22, 2023.

132.  Ms. Jackson reached out to Defendant Lee and obtained a three-day medical lay-in to recover from giving birth.  Ms. Jackson asked for additional lay-in time and obtained another week to recover.

133.  About one to two weeks after giving birth, Ms. Jackson met with a representative from the CDCR Office of the Ombudsman, a confidential resource for inmates who often serve as intermediaries between inmates and CDCR facilities to resolve inmate concerns.  The ombudsman and a second unidentified person with unknown affiliation who accompanied the ombudsman to the facility discussed with Ms. Jackson her postpartum recovery and the CIW staff's failure to provide her the proper lay-in.  After the ombudsman's visit, CIW provided Ms. Jackson a lay-in through her six-week postpartum checkup.

134.  Beginning within a week of her return to CIW, Ms. Jackson made numerous requests for follow-up appointments with Defendant Lee because she continued to experience heavy bleeding and blood clots.  Given Defendant Lee's prior abuse and mistreatment of her, Ms. Jackson would have preferred to receive treatment from another doctor.  However, Ms. Jackson understood Defendant Lee was the only OB/GYN available at CIW and, therefore, if she needed medical treatment from a doctor, she would have to receive it from him.

135.  Defendant Lee refused to see Ms. Jackson until her standard six-week postpartum checkup.  *See* CDCR Operations Manual, at 54045.7.  As a result, Ms. Jackson received no postpartum medical care from the sole OB/GYN at CIW for six weeks following the birth of her child.

136.  When Ms. Jackson did finally receive treatment at her six-week postpartum checkup, Ms. Jackson told Defendant Lee that she continued to experience heavy bleeding and blood clots.  Defendant Lee did nothing to address Ms. Jackson's medical needs during this visit and Ms. Jackson did not receive care from Defendant Inegbeje or Defendant Does 7–11 either.

Gibson, Dunn & Crutcher LLP

137.   During this six-week postpartum checkup, Defendant Lee told Ms. Jackson that everything that occurred during her labor and delivery was Ms. Jackson's fault because she had refused to induce labor.  Defendant Lee even told Ms. Jackson that she was lucky her son was alive.

138.   Defendant Lee made Ms. Jackson feel shamed, emotionally bereft, and as though her health requests would go unanswered.  Because of the abuse she suffered at the hands of Defendant Lee before and after she gave birth, Ms. Jackson no longer sought care after her six-week postpartum checkup despite continued bleeding concerns.

## H.   Ms. Jackson Submits Grievances Regarding the Misconduct She Experienced and Is Retaliated Against as a Result.

139.   On or around May 20, shortly after returning from the hospital to CIW, Ms. Jackson submitted an administrative grievance for being shackled immediately after giving birth.

140.   In late May 2023, Ms. Jackson also submitted an administrative medical grievance regarding the mistreatment and deficient medical care she received while she was in labor on May 17.  Upon information and belief, CIW personnel received Ms. Jackson's medical grievance.

141.   After submitting her medical grievance, Ms. Jackson was interviewed in a private room by Defendant Doe 6, the head registered nurse ("RN") at CIW.  In the unrecorded interview, Defendant Doe 6 asked Ms. Jackson to rescind her grievance for mistreatment during her labor and resubmit it without raising Defendant Inegbeje's abusive conduct.  Ms. Jackson refused to do so.

142.   Shortly after the interview by Defendant Doe 6, Ms. Jackson submitted a separate grievance against Defendant Doe 6 for attempting to interfere with Ms. Jackson's use of the grievance process to address the harm she suffered as a result of Defendant Inegbeje's conduct on May 17.

143.   Defendant Does 7–11 failed to provide Ms. Jackson with postpartum care beyond occasional incontinence supplies even though Ms. Jackson reported that she

Gibson, Dunn &
Crutcher LLP

continued to experience heavy bleeding and attempted to schedule medical appointments before her six-week postpartum checkup.

144.   Based on Defendant Lee's refusals to see Ms. Jackson, as well as his behavior and comments during the six-week postpartum checkup, Ms. Jackson believed he was mad at her for submitting the grievance about the inadequate care she received.

**I.     Ms. Jackson Continues to Experience Physical and Emotional Injuries Arising From the Mistreatment She Was Subjected to During the Delivery of Her Child.**

145.   In addition to the heavy bleeding and blood clotting she experienced from labor, Ms. Jackson also experienced migraines, nausea, and leg, back, and stomach pain after giving birth that she did not experience before giving birth in May 2023.

146.   In the immediate aftermath of her return to CIW, Ms. Jackson felt depressed and anxious related to the abuse and mistreatment she experienced.  Following her labor and delivery, Ms. Jackson felt guilty and worried that something bad would happen to her baby.

147.   After giving birth but before she was transferred out of CDCR custody, Ms. Jackson was diagnosed with post-traumatic stress disorder (PTSD) and depression by a psychiatrist at CIW based on her nightmares, inability to get out of bed, and loss of appetite.  Ms. Jackson also experienced anxiety in the wake of her labor experience.

148.   Following her mistreatment, abuse, and cruel and unusual punishment by Defendants, Ms. Jackson continues to suffer severe emotional trauma, including continued depression and PTSD.

149.   Ms. Jackson suffers from terrible nightmares.  In some of these nightmares, Ms. Jackson relives the abuse she suffered from Defendant Lee.   In others, Ms. Jackson's child does not survive the birth or is covered in blood.  Ms. Jackson wakes from these nightmares sweating profusely.

150.   Ms. Jackson continues to suffer emotional distress if she is treated by male doctors or medical staff following Defendant Lee's conduct.  Everyday activities or

Gibson, Dunn &
Crutcher LLP

interactions—including seeing triggering themes on television, attending programming and classes, and speaking about her labor experience—can trigger Ms. Jackson's depression and nightmares.

151.   Ms. Jackson experiences symptoms of PTSD, including when she is handcuffed, because it reminds her of being shackled immediately following the birth of her son.

152.   Ms. Jackson has been prescribed a variety of medications to treat her depression, anxiety, and night terrors following her traumatic birth experience. However, like many incarcerated individuals, Ms. Jackson has received inconsistent access to psychiatric care and medications following her traumatic experience at CIW, resulting in inconsistent and uncertain treatment, and making it difficult for Ms. Jackson to manage her conditions.  But even when Ms. Jackson has had access to prescribed medication, it does not eliminate the debilitating mental health conditions and Ms. Jackson continues to experience depression and suffer from nightmares.

## <u>COUNT I</u>
**Violation of Eighth Amendment to the United States Constitution for Improper Medical Care (42 U.S.C. § 1983)**
**Against Defendants Lee, Inegbeje, Valencia, and Does 1–11**

153.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

154.   Under the Eighth Amendment to the United States Constitution, Ms. Jackson is entitled to be free from "cruel and unusual punishment."

155.   At all times relevant to this claim, Ms. Jackson was incarcerated under the supervision of CDCR, and was entirely dependent on CDCR and its staff for her medical needs.

156.   On May 17, 2023, Ms. Jackson experienced a serious medical need when she went into labor.

157.   Defendants, including Defendant Lee, Defendant Inegbeje, Defendant Valencia, and Does 1–11, were aware of Ms. Jackson's serious medical need, yet they failed to act properly and promptly to provide Ms. Jackson with adequate medical care.

158.   These acts and failures to act by Defendant Lee, Defendant Inegbeje, Defendant Valencia, and Does 1–11 did not serve any penological purpose, and constituted the infliction of unnecessary suffering inconsistent with contemporary standards of decency.   These acts and failures to act by Defendant Lee, Defendant Inegbeje, Defendant Valencia, and Does 1–11 constituted deliberate indifference to Ms. Jackson's serious medical need in violation of the Eighth Amendment.

159.   At all times while engaged in these acts and failure to act, Defendant Lee, Defendant Inegbeje, Defendant Valencia, and Does 1–11 were acting under color and pretense of law, and under the statutes, ordinances, regulations, policies, practices, customs, and usage of the CDCR, and acting within the course and scope of their employment by CDCR.

160.   As a direct and proximate result of these acts and failure to act by Defendant Lee, Defendant Inegbeje, Defendant Valencia, and Does 1–11, Ms. Jackson has experienced and continues to experience significant physical and emotional pain and suffering.

## COUNT II
### Violation of Eighth Amendment to the United States Constitution for Excessive Force (42 U.S.C. § 1983)
### Against Defendants Inegbeje, Coria, Hernandez, Brown, and Doe 12

161.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

162.   Under the Eighth Amendment to the United States Constitution, Ms. Jackson is entitled to be free from "cruel and unusual punishment."

163.   At all times relevant to this claim, Ms. Jackson was incarcerated under the supervision of CDCR, and was entitled to be free from the unnecessary and wanton infliction of pain by CDCR and its staff.

Gibson, Dunn & Crutcher LLP

164.   Between approximately May 17, 2023 and May 18, 2023, Ms. Jackson was subjected to the unnecessary and wanton infliction of pain by Defendant Inegbeje, Defendant Coria, Defendant Hernandez, Defendant Brown, and Doe 12.

165.   The actions by Defendant Inegbeje, Defendant Coria, Defendant Hernandez, Defendant Brown, and Doe 12 did not serve any penological purpose, and constituted the unnecessary and wanton infliction of pain in violation of Ms. Jackson's rights under the Eighth Amendment.

166.   At all times while engaged in these actions Defendant Inegbeje, Defendant Coria, Defendant Hernandez, Defendant Brown, and Doe 12 were acting under color and pretense of law, and under the statutes, ordinances, regulations, policies, practices, customs, and usage of the CDCR, and acting within the course and scope of their employment by CDCR.

167.   As a direct and proximate result of these actions by Defendant Inegbeje, Defendant Coria, Defendant Hernandez, Defendant Brown, and Doe 12, Ms. Jackson has experienced and continues to experience significant physical and emotional pain and suffering.

## COUNT III
### Violation of Eighth Amendment to the United States Constitution for Sexual Assault (42 U.S.C. § 1983)
### Against Defendant Lee

168.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

169.   Under the Eighth Amendment to the United States Constitution, Ms. Jackson is entitled to be free from "cruel and unusual punishment."

170.   At all times relevant to this claim, Ms. Jackson was incarcerated under the supervision of CDCR, and was entitled to be free from sexual abuse and harassment by CDCR and its staff.

171.   During the time she was housed at CIW, Ms. Jackson was repeatedly touched by Defendant Lee in an inappropriate sexual manner.  This touching included

Gibson, Dunn & Crutcher LLP

unnecessary and unwarranted pelvic and cervical exams that were not medically necessary. Defendant Lee lied to Ms. Jackson to induce her to agree to undergo the examinations under duress and against her will.

172. Defendant Lee's sexual abuse of Ms. Jackson had no penological justification. Defendant Lee touched Ms. Jacksons in this matter for his own sexual gratification, or for the purpose of humiliating, degrading, or demeaning Ms. Jackson.

173. At all times when he was sexually abusing Ms. Jackson, Defendant Lee was acting under color and pretense of law, and under the statutes, ordinances, regulations, policies, practices, customs, and usage of the CDCR, and acting within the course and scope of his employment by CDCR.

174. As a direct and proximate result Defendant Lee's sexual abuse, Ms. Jackson experienced significant physical and emotional pain and suffering, including anxiety, nightmares, fear of male medical practitioners, and difficulty speaking about her labor process. Ms. Jackson continues to experience intense emotional suffering to this day.

## <u>COUNT IV</u>
**Violation of First and Fourteenth Amendments to the United States Constitution for Retaliation (42 U.S.C. § 1983)**
**Against Defendants Lee, Inegbeje, and Does 6–11**

175. Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

176. Under the First Amendment to the United States Constitution, Ms. Jackson has the right to petition the Government for a redress of grievance. U.S. Const. amend. I. Inmates have a protected First Amendment Right to file prison grievances and to pursue civil rights litigation from prison while being free from reprisals for doing so. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).

177. On or around May 19, 2023, Ms. Jackson submitted three prison grievances against Defendant Lee, Defendant Inegbeje and other medical staff (including Does 6–11) whom she could not identify regarding the misconduct to which she had been

subjected to surrounding medical treatment she received during labor and delivery of her son.

178.   As a result of Ms. Jackson having filed these grievances, Defendant Lee, Defendant Inegbeje, and Does 6–11 took adverse actions against Ms. Jackson with the intention of interfering with Ms. Jackson's First Amendment rights.

179.   These retaliatory actions by Defendants Lee, Inegbeje, and Does 6–11 were not a reasonable exercise of prison authority and did not advance any legitimate penological goal.

180.   These retaliatory actions by Defendants Lee, Inegbeje, and Does 6–11 would chill or silence a person of ordinary firmness from future First Amendment activities.

## COUNT V
### Violation of Article I, Section 1.1 of the California Constitution Against All Defendants

181.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

182.   Article I, section 1.1. of the California Constitution, provides that "the state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions."

183.   Ms. Jackson, while under the care and supervision of CDCR, had a reasonable expectation that her constitutional right to be free from interference with her reproductive freedom would be respected.

184.   As set forth above, Defendants' actions infringed Ms. Jackson's fundamental right to reproductive freedom, including her right to choose whether to carry her pregnancy to term or terminate her pregnancy, access appropriate medical care, and safely deliver her baby.  Defendant Lee's actions impacted Ms. Jackson's ability to make intimate decisions about her reproductive health.  This was especially true given that Ms. Jackson was in state custody, depended entirely on CDCR for her medical

Gibson, Dunn & Crutcher LLP

treatment, and was denied her requests to receive treatment from another doctor given her discomfort with Defendant Lee.  Does 1–11 failed to provide Ms. Jackson with adequate care and Defendant Inegbeje directly interfered with Ms. Jackson's labor when she forcibly closed her legs, putting her and her baby at serious risk.  While in the hospital, the actions of CIW staff, including Defendants Coria, Hernandez, Brown, and Doe 12 caused further harm, when Ms. Jackson was placed in shackles shortly after she had given birth.

**COUNT VI**
**Sexual Battery (Cal. Civ. Code § 1708.5)**
**Against Defendant Lee**

185.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

186.   While Ms. Jackson was incarcerated at CIW, and under the sole medical care of CDCR and its staff, Defendant Lee intentionally and repeatedly committed harmful and offensive touching of intimate parts of Ms. Jackson.

187.   Defendant Lee's touching of the intimate parts of Ms. Jackson had no legitimate medical purpose, but was done for Defendant Lee's own sexual gratification.

188.   Given her vulnerability as an incarcerated woman, and her complete reliance on CDCR for medical treatment during and after her pregnancy, Ms. Jackson did not act freely and voluntarily.  Defendant Lee's intentional harmful and offensive contact with intimate parts of Ms. Jackson was against Ms. Jackson's will.

189.   As a result of Defendant Lee's alleged conduct, Ms. Jackson was damaged by, among other things, suffering emotional distress, humiliation, embarrassment, and anxiety.

Gibson, Dunn &
Crutcher LLP

## COUNT VII
### Gender Violence (Cal. Civ. Code § 52.4(c)(2))
### Against Defendant Lee

190.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

191.   While Ms. Jackson was incarcerated at CIW, and under the sole medical care of CDCR and its staff, Defendant Lee repeatedly subjected Ms. Jackson to physical intrusions of a sexual nature.

192.   Defendant Lee falsely represented to Ms. Jackson that these physical intrusions and invasions were necessary medical procedures.   By preying on Ms. Jacksons' vulnerability, Defendant Lee coerced her into these sexual intrusions despite the lack of medical necessity.

193.   As a result, Ms. Jackson has suffered and will continue to suffer mental and physical pain and suffering.

## COUNT VIII
### Tom Bane Civil Rights Act (Cal. Civ. Code § 52.1)
### Against Defendant Lee

194.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

195.   Defendant Lee by threats, intimidation, and coercion deprived Ms. Jackson of her rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, including by acting with deliberate indifference to Ms. Jackson's medical needs.

196.   Defendant Lee by threats, intimidation, and coercion caused Ms. Jackson to reasonably believe that if she exercised her rights under the First Amendment, Defendant Lee would commit violence against her, and that Defendant Lee had the ability to carry out those threats.

Gibson, Dunn & Crutcher LLP

36

197.   Defendant Lee acted violently against Ms. Jackson to prevent her from exercising her rights under the First Amendment to the United States Constitution

198.   Defendant Lee intended to deprive Ms. Jackson of her enjoyment of the interests protected under the First, Eighth, and Fourteenth Amendments to the United States Constitution.  At a minimum, Defendant Lee acted with reckless disregard of Ms. Jackson's rights.

199.   Ms. Jackson was harmed and Defendant Lee's conduct was a substantial factor in causing Ms. Jackson's harm.

## COUNT IX
### The Ralph Civil Rights Act (Cal. Civ. Code § 51.7)
### Against Defendant Lee

200.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

201.   Defendant Lee intentionally committed violence and threatened violence against Ms. Jackson, and a substantial motivating reason for Defendant's Lee violence and threats of violence against Ms. Jackson was her sex.

202.   A reasonable person in Ms. Jackson's position would have believed that Defendant Lee would carry out his threat.

203.   A reasonable person in Ms. Jackson's position would have been intimidated by the violence and threats of violence Defendant Lee committed against Ms. Jackson.

204.   Ms. Jackson was harmed and Defendant Lee's conduct was a substantial factor in causing Ms. Jackson's harm.

## COUNT X
### Professional Negligence
### Against Defendants Lee, Inegbeje, Does 1–11

205.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

Gibson, Dunn &
Crutcher LLP

37

206.   At all times relevant herein, Ms. Jackson was incarcerated at CIW, and under the sole medical care of CDCR and its staff, including Defendant Lee, Defendant Inegbeje, and Does 1–11.

207.   As a medical health providers, Defendant Lee, Defendant Inegbeje, and Does 1–11 owed a duty of care to Ms. Jackson.

208.   Defendant Lee, Defendant Inegbeje, and Does 1–11 repeatedly breached this duty of care to Ms. Jackson.

209.   Defendant Lee, Defendant Inegbeje, and Does 1–11 negligently failed to exercise the degree of skill, qualification, ability, experience, judgment, and knowledge ordinarily possessed and exercised by other health providers and other medical clinics, and the like, engaged in the same profession in the same or similarly locality.

210.   As a result of these breaches of their professional duties by Defendant Lee, Defendant Inegbeje, and Does 1–11, Ms. Jackson experienced significant physical and emotional pain and suffering.

## COUNT XI
### Battery
### Against Defendants Lee and Inegbeje

211.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

212.   While Ms. Jackson was incarcerated at CIW, and under the sole medical care of CDCR and its staff, Defendant Lee and Defendant Inegbeje touched Ms. Jackson with the intent to harm or offend her.

213.   Ms. Jackson did not consent to that touching, or Ms. Jackson's consent to the touching was obtained by fraud.

214.   Ms. Jackson was harmed by the nonconsensual touching by Defendant Lee and Defendant Inegbeje.

215.   A reasonable person in Ms. Jackson's situation would have been offended by Defendant Lee's and Defendant Inegbeje's nonconsensual touching.

## COUNT XII
### Intentional Infliction of Emotional Distress
### Against All Defendants

216.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

217.   At all times relevant herein, Ms. Jackson was incarcerated at CIW, and under the sole medical care of CDCR and its staff, including Defendant Lee, Defendant Inegbeje, Defendant Coria, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–20, who occupied a special position of authority and trust with regard to Ms. Jackson.

218.   Because of this special relationship owed by medical providers to their patients, as well as the special relationship between prison officials and inmates, Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12 owed Ms. Jackson a duty of care to refrain from taking actions that would cause her to experience extreme emotional distress.

219.   Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12 engaged in the above conduct, which was outrageous.

220.   Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12 engaged in the above conduct with the intent to cause harm to Ms. Jackson, or with reckless disregard of the probability that Ms. Jackson would suffer emotional distress.

221.   The outrageous conduct of Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12, described above and incorporated herein, caused Ms. Jackson to experience severe emotional distress.

222.   The outrageous conduct of Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12, described above

Gibson, Dunn &
Crutcher LLP

and incorporated herein, was a substantial factor in causing Ms. Jackson severe emotional distress.

## COUNT XIII
### Negligent Infliction of Emotional Distress
### Against All Defendants

223.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

224.   At all times relevant herein, Ms. Jackson was incarcerated at CIW, and under the sole medical care of CDCR and its staff, including Defendant Lee, Defendant Inegbeje, Defendant Coria, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–20, who occupied a special position of authority and trust with regard to Ms. Jackson.

225.   Because of this special relationship owed by medical providers to their patients, as well as the special relationship between prison officials and inmates, Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12 owed Ms. Jackson a duty of care to refrain from taking actions that would cause her to experience extreme emotional distress.

226.   Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12 repeatedly breached this duty of care to Ms. Jackson.

227.   The negligent conduct of Defendant Lee, Defendant Inegbeje, Defendant Valenica, Defendant Hernandez, Defendant Brown, and Does 1–12, incorporated herein, caused Ms. Jackson to experience severe emotional distress.

228.   Due to the above-mentioned negligence, Ms. Jackson has suffered severe emotional injury.

Gibson, Dunn &
Crutcher LLP

## COUNT XIV
### Negligence Per Se
### Against All Defendants

229.   Ms. Jackson incorporates herein by reference, as though set forth in full, all preceding paragraphs of this Complaint.

230.   Through their actions described above, each of the Defendants violated some or all of the statutes, ordinances, and regulations of a public entity set forth below:

      a.    California Penal Code section 3407(a) provides that "An inmate known to be pregnant or in recovery after delivery shall not be restrained by the use of leg irons, waist chains, or handcuffs behind the body."

      b.    California Penal Code section 3409(a) provides that "A person incarcerated in state prison who menstruates or experiences uterine or vaginal bleeding shall, upon request, have access to, and be allowed to use, materials necessary for personal hygiene with regard to their menstrual cycle and reproductive system, including, but not limited to, sanitary pads and tampons, at no cost to the incarcerated person."

      c.    California Penal Code section 4023.8(*l*) provides that an incarcerated pregnant person "in labor or presumed to be in labor shall be treated as an emergency and shall be transported to the outside facility."

      d.    California Penal Code section 4023.8(o) provides that an incarcerated pregnant person must "be given the maximum level of privacy possible during the labor and delivery process" and that a prison guard must be "stationed outside the room rather than in the room absent extraordinary circumstances."

      e.    California Penal Code section 4023.8(p) provides that postpartum incarcerated individuals be examined by a "physician, nurse

Gibson, Dunn &
Crutcher LLP

practitioner, certified nurse midwife, or physician assistant . . . within one week from childbirth and as needed for up to 12 weeks postpartum" and "be given at least 12 weeks of recovery after any childbirth before they are required to resume normal activity."

231.   Defendants' violations of these statutes, ordinances, and regulations proximately caused Ms. Jackson to experience significant physical and emotional pain and suffering.

232.   The significant physical and emotional pain and suffering Ms. Jackson experienced is the type of harm the aforementioned statutes, ordinances, and regulations were intended to prevent.

233.   Ms. Jackson is within the class of persons for whose protections these statutes, ordinances, and regulations were adopted.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Jackson respectfully requests from this Court:

1.     General and compensatory damages in an amount according to proof at trial;

2.     Punitive damages to punish Defendants for their malicious, oppressive, or fraudulent conduct and to deter similar actions in the future;

3.     Three times the amount of actual damages under Cal. Civ. Code § 52(a);

4.     Attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i);

5.     Costs of suit herein incurred;

6.     Pre- and post-judgment interest as permitted by law; and

7.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Ms. Jackson demands trial by jury on all issues so triable.

Gibson, Dunn & Crutcher LLP

1    DATED: May 14, 2025                    Respectfully submitted,

2                                           GIBSON, DUNN & CRUTCHER LLP

3

4                                           By: */s/ Heather Richardson*
                                                Heather Richardson
5                                               Jessica Valenzuela
                                                Elizabeth K. McCloskey
6
                                           *Attorneys for Plaintiff Alexandra Jackson*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP