GIBSON, DUNN & CRUTCHER LLP
HEATHER RICHARDSON, SBN 246517
  HRichardson@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.:  213.229.7000
Fax:  213.229.7520

JESSICA VALENZUELA, SBN 220934
  JValenzuela@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301-1744
Tel.:  650.849.5300
Fax:  650.849.5333

ELIZABETH K. MCCLOSKEY, SBN 268184
  EMcCloskey@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, CA 94111-3715
Tel.:  415.393.8200
Fax:  415.393.8306

*Attorneys for Plaintiff*
*Alexandra Jackson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA JACKSON, an individual, <br><br> Plaintiff, <br><br> v. <br><br> SCOTT LEE, an individual; COMFORT INEGBEJE, an individual; OFFICER A. CORRIA-BARRIGA, an individual; LIEUTENANT J. BROWN, an individual; OFFICER L. VALENCIA, an individual; OFFICER L. HERNANDEZ, an individual; and DOES 1–20, individuals, <br><br> Defendants. | CASE NO. 5:25-cv-01177-SSS-SHK <br><br> **OPPOSITION TO DEFENDANT LEE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br><br> Judge: Hon. Sunshine S. Sykes <br> Date: February 13, 2026 <br> Time: 2:00 p.m. <br> Courtroom: Courtroom 2, 2nd Floor <br><br> Trial Date: None set <br> Action Filed: May 14, 2025 |

Gibson, Dunn &
Crutcher LLP

i

## TABLE OF CONTENTS

**I. INTRODUCTION** ......................................................................................................1

**II. BACKGROUND** .....................................................................................................2

   **A. Ms. Jackson Is Incarcerated After Learning She Is Pregnant.** .............2

   **B. Lee Abuses Ms. Jackson During Prenatal Appointments.** .....................2

   **C. Lee Prevents Ms. Jackson From Delivering Her Baby In A Hospital And Coerces Her To Submit To An Unnecessary And Invasive Examination While In Labor.** .......................................................................4

   **D. Ms. Jackson Delivers Her Son At TTA Without Pain Relief Or Assistance Of Competent Medical Staff.** ..........................................................5

**III. LEGAL STANDARD** .........................................................................................5

**IV. ARGUMENT** ........................................................................................................6

   **A. Ms. Jackson Made A Timely Claim Under The Government Claims Act.** ...................................................................................................................6

   **B. Ms. Jackson Has Stated A Claim Under Article I, Section 1.1 Of The California Constitution.** ......................................................................7

     1. Section 1.1 Protects Reproductive Freedom Beyond Contraception And Abortion. .............................................................................................8

     2. Lee Violated Ms. Jackson's Constitutional Reproductive Freedom By Denying Her Right To Make Decisions Related To Childbirth. .................12

   **C. Ms. Jackson Has Alleged A Claim Against Lee For Negligence.** ..........13

     1. Counts XIII And XV Each State Separate Claims For Negligence Arising From Breaches Of Different Duties And Resulting In Separate Injuries. ...13

     2. Counts XIII And XV Plead That Lee Owed Ms. Jackson Duties. ..........15

**V. CONCLUSION** .....................................................................................................18

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

## Cases

*Am. Acad. of Pediatrics v. Lungren*,
16 Cal.4th 307 (1997) ..................................................................................... 7, 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 5

*Astiana v. Hain Celestial Group, Inc.*,
783 F.3d 753 (9th Cir. 2015) ........................................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................... 6

*Bowling v. Enomoto*,
514 F.Supp. 201 (N.D. Cal. 1981) ................................................................... 14

*Busker v. Wabtec Corp.*,
11 Cal.5th 1147 (2021) ............................................................................. 10, 11

*California v. Superior Ct.*,
32 Cal.4th 1234 (2004) ...................................................................................... 7

*City of Brentwood v. Cent. Valley Reg'l Water Quality Control Bd.*,
123 Cal.App.4th 714 (2004) ............................................................................... 8

*Crowley v. Katleman*,
8 Cal.4th 666 (1994) ........................................................................................ 14

*Dent v. Nat'l Football League*,
968 F.3d 1126 (9th Cir. 2020) ......................................................................... 16

*Dyna-Med, Inc. v. Fair Emp. & Hous. Comm'n*,
43 Cal.3d 1379 (1987) ................................................................................. 8, 10

*Emery v. Warm Springs Rd. CVS, LLC*,
2024 WL 2831351 (D. Nev. Feb. 23, 2024) ................................................... 17

*Flanagan v. Flanagan*,
27 Cal.4th 766 (2002) ........................................................................................ 9

*Foman v. Davis*,
371 U.S. 178 (1962) ......................................................................................... 17

*Giraldo v. Dep't of Corr. & Rehab.*,
168 Cal.App.4th 231 (2008) ............................................................................. 16

*Gonzales v. California Dep't of Corr.*,
739 F.3d 1226 (9th Cir. 2014) ......................................................................... 14

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal.4th 1 (1994) .............................................................................................. 8

Gibson, Dunn &
Crutcher LLP

*Ileto v. Glock, Inc.*,
    349 F.3d 1191 (9th Cir. 2003) .................................................................................... 13

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014) ......................................................................................... 6, 17

*Landeros v. Flood*,
    17 Cal.3d 405 (1976) .................................................................................. 15, 17

*Lawson v. Superior Ct.*,
    180 Cal.App.4th 1372 ................................................................................ 16, 17

*In re Long*,
    127 Cal.Rptr. 732 (Ct. App. 1976) ................................................................... 14

*Los Angeles Sch. Dist. v. Garcia*,
    58 Cal.4th 175 (2013) ....................................................................................... 11

*MacIsaac v. Waste Mgmt. Collection & Recycling, Inc.*,
    134 Cal.App.4th 1076 (2005) ............................................................................. 8

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) .............................................................................. 6

*People v. Wade*,
    63 Cal.4th 137 (2016) ....................................................................................... 10

*Recorder v. Comm'n on Jud. Performance*,
    72 Cal.App.4th 258 (1999) ............................................................................... 10

*Romero v. Securus Techs., Inc.*,
    216 F.Supp.3d 1078 .......................................................................................... 15

*Rosales v. City of Los Angeles*,
    82 Cal.App.4th 419 (2000) ............................................................................... 16

*Skinner v. Switzer*,
    562 U.S. 521 ........................................................................................................ 6

*United States v. Herrera*,
    974 F.3d 1040 (9th Cir. 2020) ............................................................................ 9

*West v. Atkins*,
    487 U.S. 42 (1988) ............................................................................................ 14

**Constitutional Provisions**

Cal. Const., Art. I, § 1.1 ............................................................................................ 7, 9

Mich. Const., Art. I, § 28(1) ....................................................................................... 10

Mo. Const., Art. I, § 36 .............................................................................................. 10

Gibson, Dunn &
Crutcher LLP

iv

Nev. Const., Art. I, § 25 ...............................................................................................10

**Statutes**

Cal Gov. Code § 910.....................................................................................................7

Cal Gov. Code § 911.2..................................................................................................7

Cal Gov. Code § 945.4..................................................................................................7

Cal Gov. Code § 950.2..................................................................................................7

Cal. Health & Safety Code § 123462 ........................................................................11

Cal. Penal Code § 3408.............................................................................12, 15, 17, 18

Cal. Penal Code § 4023.8..........................................................................15, 16, 17, 18

Code Civ. Proc. § 1858.................................................................................................8

Code Civ. Proc. § 1859...............................................................................................12

**Other Authorities**

Cal. Bill Analysis, A.B. 2223 Assemb. (June 14, 2022) ...........................................11

Assemb. Comm. on Judiciary, 2021–2022 Reg. Sess., SCA 10 (2022)......................11

Cal. Dep't Of Corr. & Rehab., Health Care Manual ................................................12

Cal. Dep't Of Corr. & Rehab., Operations Manual.................................................12

Merriam Webster, https://www.merriam-webster.com/dictionary/reproduction...............................................................10

**Rules**

Fed. R. Civ. Proc. Rule 8(a)(2) ...................................................................................6

Gibson, Dunn & Crutcher LLP

v

## I.    INTRODUCTION

Defendant Scott Lee, a male OB/GYN at a state prison for women, has a history of abusing his position to sexually assault and mistreat his patients.  Plaintiff Alexandra Jackson became one of Lee's victims in 2023 when she was incarcerated in the prison where Lee worked.  At the time, Ms. Jackson was pregnant, in her second trimester.  For prenatal care, Ms. Jackson's only option was to see Lee.  Lee's behavior during Ms. Jackson's prenatal appointments was menacing, coercive, and abusive: he pressured her to get an abortion, he told her that women in prison should not have babies, and he coerced Ms. Jackson to agree to multiple unnecessary pelvic and breast examinations for his sexual gratification.

Lee's abuse culminated on the day Ms. Jackson went into labor.  Even though Lee was present while Ms. Jackson was in active labor at the on-site prison medical facility, Lee refused to see her in retaliation for Ms. Jackson refusing to agree to an induction.  Even after Lee finally attended to Ms. Jackson, he denied her the right to be taken to a hospital for safe delivery.  Instead, Lee—using lies and coercion—forced Ms. Jackson to undergo an unnecessary pelvic examination before allowing medical staff to call an ambulance for her.  The ambulance did not arrive on time, and Ms. Jackson gave birth in the prison medical facility without pain relief or adequate medical staff.

Ms. Jackson's First Amended Complaint ("Complaint") alleges twelve causes of action under state and federal law against Lee arising from his misconduct.  Lee's motion does not explicitly challenge nine of those twelve claims: deliberate indifference under the Eighth Amendment (Count I), sexual assault under the Eighth Amendment (Count III), retaliation under the First Amendment (Count IV), sexual battery (Count VI), gender violence (Count VII), violation of the Tom Bane Civil Rights Act (Count VIII), violation of the Ralph Civil Rights Act (Count IX), battery (Count X), and intentional infliction of emotional distress (Count XII).  Rather, Lee takes issue with the allegations supporting three causes of action: violation of California's constitutional reproductive rights protection (Count V), and two separate claims of negligence (Count XIII, Count

Gibson, Dunn & Crutcher LLP

1

XV).  None of Lee's arguments have merit, and Ms. Jackson adequately pleads all claims asserted against Lee.

## II.    BACKGROUND

### A.    Ms. Jackson Is Incarcerated After Learning She Is Pregnant.

On August 29, 2022, Alexandra Jackson learned she was pregnant with her fourth child.  ¶ 55.[1]  She and her fiancé were excited by the news.  Four days later, Ms. Jackson was detained for an alleged probation violation.  ¶ 56.  She pled guilty to one count of non-violent financial fraud and was sentenced to 31 months in prison.  ¶ 57.  When Ms. Jackson was transferred to the California Institution for Women ("CIW") in February 2023, she was in her second trimester.  ¶ 64.

### B.    Lee Abuses Ms. Jackson During Prenatal Appointments.

Soon after Ms. Jackson arrived at CIW, she was scheduled for an intake appointment with Lee, the only doctor available at CIW to provide OB/GYN care.  ¶ 66. Lee had a long history of exploiting his position at CIW to sexually assault the women he treated.  ¶ 65.

During Ms. Jackson's initial intake appointment—her first introduction to Lee— Lee was stand-offish and irritated.  ¶ 67.  Lee told Ms. Jackson women in prison should not be having babies and remarked that it would be easier if she got an abortion.  *Id.*  At one point, the nurse who was initially present during the appointment left the room.  ¶ 68.  While alone with Ms. Jackson, Lee requested that Ms. Jackson submit to a pelvic examination, which she declined.  ¶ 69.

For the next three months, Ms. Jackson's only choice was to have regular prenatal appointments with Lee.  ¶¶ 70, 80–81.  During these appointments, Lee continued to avoid participating in Ms. Jackson's care while nurses were present.  ¶ 71.  However, as soon as Lee arranged for nurses to leave the examination room, Lee would promptly demand Ms. Jackson submit to pelvic examinations.  ¶¶ 73–74.

In April and May 2023, Lee began to make repeated requests to examine Ms.

---

[1] References to the Complaint (Dkt. 24) are cited using as "¶ _".

Jackson's cervix during each appointment. *Id.* When Ms. Jackson refused, Lee (incorrectly) told her the procedure was necessary, and said that her refusal meant that she "must not care about [her] baby." ¶ 75. On at least two occasions during this period, Lee succeeded in coercing Ms. Jackson into allowing him to perform pelvic examinations, even though she expressed that she did not want to undergo the examinations. ¶ 77. Lee's pelvic examinations were unusual: they took significantly longer than those performed by other physicians and Lee caressed her stomach throughout. *Id.* It appeared that Lee was getting sexual gratification from pelvic examinations given his insistence on performing the procedure when other staff was absent, his unprofessional enthusiasm in doing so, and his abnormal methods. *Id.*

Beginning in late April, Lee also demanded that Ms. Jackson submit to breast examinations. ¶ 78. Lee used the same shaming tactics to convince Ms. Jackson that she could harm her unborn child by refusing the examinations. *Id.* On at least one occasion, Ms. Jackson succumbed to Lee's persistent demands, even though she did not want him to perform the breast examination. ¶ 79.

Ms. Jackson repeatedly sought outside gynecological care, to no avail. ¶¶ 80–81. She asked CIW's medical staff whether she could see a different physician at an outside hospital using her own medical insurance but was told that was not possible. ¶ 80. At numerous appointments, Ms. Jackson told Lee that she was uncomfortable with him and pleaded that he refer her to an outside medical provider for all necessary pelvic examinations, but Lee refused her requests. ¶ 81.

Lee also pressured Ms. Jackson to induce labor well ahead of her scheduled due date for no reason other than his own convenience. ¶ 82. Based on her prior pregnancies, Ms. Jackson did not think there was a need to induce labor. *Id.* Lee nevertheless scheduled Ms. Jackson to be induced into labor on May 13, 2023. ¶ 83. Ms. Jackson refused the induction, but Lee rescheduled another induction for May 18, 2023. *Id.* Ms. Jackson went into labor naturally on May 17, 2023. ¶ 84.

Gibson, Dunn &
Crutcher LLP

3

**C.**    **Lee Prevents Ms. Jackson From Delivering Her Baby In A Hospital And Coerces Her To Submit To An Unnecessary And Invasive Examination While In Labor.**

At 2 p.m. on May 17, 2023, Ms. Jackson began to experience contractions while in her cell.  ¶ 84.  She was transported to the CIW on-site Triage and Treatment Area ("TTA"), arriving at approximately 3:04 p.m.  ¶¶ 84–87.  At the TTA, Ms. Jackson was left unattended in the hallway, undressed from the waist down and screaming from painful contractions.  ¶ 87–88.  Only after Ms. Jackson's water broke, Defendant Comfort Inegbeje, a nurse at CIW, moved Ms. Jackson from the hallway into an open room.  ¶ 88  During this entire period, Lee was aware that Ms. Jackson was in labor, as she was in view of the medical staff and was pleading for help.  ¶¶ 87–8.  Ms. Jackson's room had no curtains, Ms. Jackson was not wearing a gown, and inmates and CIW staff walking by could see Ms. Jackson half-naked, giving birth.  ¶ 89.

Ms. Jackson repeatedly begged to be taken to the hospital.  ¶ 90.  Inegbeje explained that Lee had specifically instructed her not to call for an ambulance until Lee examined Ms. Jackson.  *Id.*  Yet, Lee did not attend to Ms. Jackson; nor was there any medical basis for an examination.  ¶¶ 90, 94–95, 98–99.  Lee was intentionally delaying Ms. Jackson's care as punishment for her unwillingness to be induced.  ¶¶ 92–93.

At approximately 3:45 p.m., Lee finally came to Ms. Jackson's room.  ¶ 92.  Lee taunted Ms. Jackson, suggesting that her labor would have been easier if she had agreed to be induced.  ¶ 93.  Lee then told Ms. Jackson that he would not call an ambulance unless she allowed him to examine her cervix, telling her the examination was necessary to determine which hospital to send her to.  ¶ 94.  To further coerce Ms. Jackson into complying, Lee explained that his decision would impact how much time she would be able to spend with her baby after his birth.  *Id.*  In pain and desperate to go to a hospital, Ms. Jackson submitted to the procedure.  ¶¶ 95–96.

Immediately after examining Ms. Jackson's cervix, Lee admitted that his purported rationale for the procedure was a sham and told Ms. Jackson that the EMTs would decide which hospital to take her to.  ¶¶ 98–99.  He then allowed the medical staff

Gibson, Dunn & Crutcher LLP

to call for an ambulance and left the room around 3:48 p.m.  ¶¶ 100–01.

**D.     Ms. Jackson Delivers Her Son At TTA Without Pain Relief Or Assistance Of Competent Medical Staff.**

Within five minutes after Lee's exam, Ms. Jackson felt the uncontrollable urge to push.  ¶ 102.  In response, Inegbeje panicked and slammed Ms. Jackson's legs together yelling "No, don't push!" causing Ms. Jackson severe pain.  ¶ 102–03.  When Ms. Jackson yelled out that Inegbeje was hurting her and asked that she let go of Ms. Jackson's legs, Inegbeje huffed out of the room.  *Id.*  Shortly thereafter, Inegbeje reentered and forced Ms. Jackson's legs shut again.  ¶ 104.  During this exchange, Lee—the only doctor around to provide assistance—stood directly outside Ms. Jackson's room and refused to enter until Ms. Jackson's baby was crowning.  ¶ 105.

Ms. Jackson gave birth at around 4:07 p.m. in the TTA while awaiting transport to a hospital.  ¶ 106.  When her baby was born, his skin was blue, and he was not breathing.  ¶ 107.  Despite these clear signs of distress, no one on the CIW medical staff, including Lee, provided any aid, at which point the EMTs arrived and intervened to provide Ms. Jackson's baby with oxygen and other necessary care.  ¶ 107–08.  Because Lee delayed summoning an ambulance and refused to supply medical care and supervise his staff, Ms. Jackson was forced to endure labor and delivery without the help of competent medical professionals and without pain medication, including an epidural.  ¶¶ 102–07.  She experienced significant physical and emotional pain as a direct result.  ¶¶ 106, 147–54.

### III.     LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, the pleadings need not contain detailed factual allegations in order to survive, but rather "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which

Gibson, Dunn & Crutcher LLP

it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing Fed. R. Civ. Proc. Rule 8(a)(2)) (citation modified).  For the purposes of a motion to dismiss, all allegations in the complaint "are accepted as true, as well as all reasonable inferences to be drawn from them." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of a legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014); *see also Skinner v. Switzer*, 562 U.S. 521, 530 ("[A] complaint need not pin plaintiff's claim for relief to a precise legal theory.")  Indeed, Rule 8's light pleading requirements seek to avoid "cases turning on technicalities." *Johnson*, 574 U.S. at 11.

## IV.    ARGUMENT

Lee challenges only a subset of Ms. Jackson's claims against him.  First, Lee argues that Ms. Jackson's state law claims are barred because she purportedly did not submit a required claim under the California Government Claims Act.  Lee does not specify which claims are subject to dismissal on this basis.  Indeed, Ms. Jackson made a timely claim and this argument fails.

Second, Lee argues Ms. Jackson does not state a claim under Section 1.1 of the California Constitution for violation of her right to reproductive freedom.  Lee attempts to limit the constitutional provision to protect only the rights to contraception and abortion, without any authority for such a narrow interpretation.  Lee's interference with Ms. Jackson's labor and delivery is sufficient to state a claim.

Third, Lee argues that Ms. Jackson cannot maintain negligence claims based on alternative theories and must combine the negligence claims into a single count.  He also argues that Ms. Jackson has not identified a statute that establishes that Lee owed her a duty.  Lee is wrong on both counts, and Ms. Jackson adequately pleads her negligence claims.

### A.    Ms. Jackson Made A Timely Claim Under The Government Claims Act.

Ms. Jackson fully complied with the Government Claims Act.    Under the

Gibson, Dunn & Crutcher LLP

6

Government Claims Act, an individual seeking to sue a California employee for violations of state law based on actions within the course and scope of the employee's employment must first make a claim. *See* Cal Gov. Code §§ 945.4, 950.2. Such claim must be filed with the Department of General Services within six months of the accrual of the cause of action. *Id.* §§ 910, 911.2. The claim requirement only applies to state law claims and is not a prerequisite to federal causes of action. *California v. Superior Ct.*, 32 Cal.4th 1234, 1240 (2004) (stating that "the supremacy clause precluded us from applying the [claim presentment] requirement to the federal cause of action").

Here, as Ms. Jackson alleged, she submitted a claim on November 15, 2023. ¶25. The claim asserted that Lee engaged in abuse, neglect, unwanted touching, and interference with Ms. Jackson's reproductive decision-making during her labor and delivery on May 17, 2023. *See* ECF No. 29-3. Thus, Ms. Jackson's claim included all state law causes of actions asserted against Lee in the Complaint. *See id.*; *see also* Counts V–X, XII, XIII, XV (all alleging claims arising from Lee's conduct on May 17, 2023). Lee's argument that Ms. Jackson did not comply with the Government Claims Act for some unspecified state law claims therefore fails. *See* ¶ 25; ECF No. 29-3.

**B.   Ms. Jackson Has Stated A Claim Under Article I, Section 1.1 Of The California Constitution.**

Article I, Section 1.1. of the California Constitution furthers "the constitutional right to privacy guaranteed by Section 1 [of the California Constitution]" by protecting an individual's autonomy in "their most intimate decisions" relating to "reproductive freedom." Cal. Const. Art. 1, § 1.1 ("Section 1.1"). Section 1 and Section 1.1 protect "autonomy privacy," *i.e.*, an individual's "interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference." *Am. Acad. of Pediatrics v. Lungren*, 16 Cal.4th 307, 332 (1997). A plaintiff alleging interference with any autonomy privacy interest must establish each of the following: (1) a legally protected privacy interest in making intimate personal decisions; (2) a reasonable expectation of autonomy with regards to that decision under

Gibson, Dunn &
Crutcher LLP

7

the circumstances; and (3) conduct by defendant constituting a serious intrusion or interference with the exercise of their autonomy. *See Hill v. Nat'l Collegiate Athletic Ass'n.*, 7 Cal.4th 1, 39–40 (1994); *see also Am. Acad. of Pediatrics*, 16 Cal.4th at 331–39.

Lee only challenges the first element. He argues that Ms. Jackson has not alleged a violation of a legally protected interest, claiming that the "rights to choose or refuse contraception and to decide whether to terminate a pregnancy" are the sole privacy interests afforded protection under Section 1.1, and asserting that his alleged conduct on May 17, 2023—"interfer[ing] with access to appropriate medical care, and infring[ing] upon [Ms. Jackson's] right to … safely deliver her baby"—does not implicate those rights. Mot. 7–8 (internal quotation marks omitted). But, as set forth below, that argument finds no basis in the language or intent of Section 1.1, which confirm that Section 1.1 offers broad protections for intimate decisions related to pregnancy and childbirth, beyond abortion and contraception rights. Under those broad protections, Ms. Jackson has stated a claim, as explained in more detail below.

### 1. Section 1.1 Protects Reproductive Freedom Beyond Contraception And Abortion.

Courts must interpret statutes "to determine and give effect to the underlying legislative intent." *City of Brentwood v. Cent. Valley Reg'l Water Quality Control Bd.*, 123 Cal.App.4th 714, 722 (2004); *see also* Code Civ. Proc. § 1859 ("In the construction of a statute the intention of the Legislature … is to be pursued"). "The Legislature's chosen language is the most reliable indicator of its intent." *MacIsaac v. Waste Mgmt. Collection & Recycling, Inc.,* 134 Cal.App.4th 1076, 1082 (2005). Courts must give "to the language its usual, ordinary import and accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose" and in a manner that avoids "making some words surplusage." *Dyna-Med, Inc. v. Fair Emp. & Hous. Comm'n*, 43 Cal.3d 1379, 1386–87 (1987); *see also* Code Civ. Proc. § 1858 ("In the construction of a statute or instrument, the office of the Judge is simply to ascertain and

Gibson, Dunn & Crutcher LLP

declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted"). Here, based on its language and legislative context, Section 1.1 must be construed broadly to protect against interference with an individual's interest in making *all* decisions relating to reproduction, including childbirth.

*First*, the text of Section 1.1 confirms that its protections extend beyond decisions relating to abortion and contraception. The relevant language of Section 1.1 states that "the state shall not deny or interfere with an individual's ***reproductive freedom*** in their most intimate decisions, which ***includes*** their fundamental right to choose to have an abortion and their fundamental right to choose or refuse contraceptives." Cal. Const. Art. 1, § 1.1 (emphases added). Lee's interpretation of Section 1.1 to apply *only to* decisions as to contraception and abortion disregards the words "***which includes***" which make clear that abortion and contraception are non-exclusive examples of protected interests. Indeed, a statute's use of "includes" or similar language when preceding a list signifies that the list is non-exhaustive. *See, e.g.*, *Flanagan v. Flanagan*, 27 Cal.4th 766, 774 (2002); *see also United States v. Herrera*, 974 F.3d 1040, 1048 (9th Cir. 2020) (holding that the use of "include" before introducing a list creates "the presumption … that the list is providing only examples from a larger group"). For example, in *Flanagan*, the California Supreme Court interpreted the meaning of "confidential communication" in the context of California Penal Code § 632, which provides that the term "***includes*** any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." *Flanagan*, 27 Cal.4th at 769 (emphasis added). The Court rejected the lower court's more narrow interpretation that "'confidential communication' not only *includes* but is *limited to* conversations whose content is to be kept secret" because the lower court's reading did not "conform to the inclusive language" of the provision. *Id.* at 774. Under the California Supreme Court's reasoning in *Flanagan*, Section 1.1 cannot be read to limit the definition of "reproductive freedom" to abortion and contraception.

Gibson, Dunn &
Crutcher LLP

*Second*, legislative provisions "should be construed in accordance with the natural and ordinary meaning of the words as generally understood at the time of its enactment." *See Recorder v. Comm'n on Jud. Performance*, 72 Cal.App.4th 258, 268 (1999).  The ordinary meaning of "reproductive freedom" in 2022, when Section 1.1 was enacted, was broad.  "Reproduction" encompasses the entire process of creating new life, including childbirth.[2]  The sole appellate authority interpreting Section 1.1, *Carpenter v. Superior Court*, confirms that reproductive freedom includes a mother's right to make "decisions about her childbirth."  *See* 93 Cal.App.5th 1279, 1313 (2023).  The definitions of "reproductive freedom" in other state constitutional amendments passed around the same time further confirm the broad ordinary meaning of the term.  *See, e.g.*, Mich. Const., Art. I, § 28(1) (enacted in 2022, providing that reproductive freedom includes decisions related to "prenatal care, childbirth, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care"); Nev. Const., Art. I, § 25 (passed by the legislature in 2023, similar); Mo. Const., Art. I, § 36 (adopted in 2024, defining reproductive freedom as "the right to make and carry out decisions about all matters relating to reproductive health care, including ... prenatal care, childbirth, ... and respectful birthing conditions").  Other states' definitions of "reproductive freedoms" "can provide valuable insight." *See People v. Wade*, 63 Cal.4th 137, 141 (2016).  Lee's narrow interpretation of "reproductive freedom" therefore conflicts with the ordinary meaning of the term.  If California had intended to limit Section 1.1's scope to abortion and contraception, it could have done so.

*Third*, other California legislation on reproductive freedoms supports a broad interpretation of the term.  *See Busker v. Wabtec Corp.*, 11 Cal.5th 1147, 1157–58 (2021) (California courts look to legislation "relating to the same subject" to ensure that the statutes are "harmonize[d]"); *Dyna-Med, Inc.*, 43 Cal.3d 1379, 1387 (1987) (same).

---

[2] *See, e.g.*, Merriam Webster, https://www.merriam-webster.com/dictionary/reproduction (last visited Dec. 5, 2025) (defining "Reproduction" to mean "the process by which . . . animals give rise to offspring and which fundamentally consists of the segregation of a portion of the parental body by a sexual or an asexual process and its subsequent growth and differentiation into a new individual.")

Gibson, Dunn & Crutcher LLP

California's Reproductive Privacy Act ("RPA"), like Section 1.1, protects "personal reproductive decisions" and recognizes "a fundamental right of privacy" with respect to such decisions. Cal. Health & Safety Code § 123462. Indeed, the California legislature expanded the scope of reproductive rights protected under the RPA at the same time Section 1.1 was making its way through the legislature. *See, e.g.*, Cal. Bill Analysis, A.B. 2223 Assemb. (June 14, 2022) (identifying proposed RPA amendments and Section 1.1 as "related legislation" set to be heard on the same day). Because the RPA concerns the same subject matter as Section 1.1, Section 1.1 should be read harmoniously with the RPA. *See Busker*, 11 Cal.5th at 1147. And, because the RPA explicitly protects an individual's right to make decisions relating to "***all matters*** relating to pregnancy," including "prenatal care" and "childbirth," the definition of "intimate decisions" relating to "reproductive freedom" in Section 1.1 must be read to include "prenatal care" and "childbirth" so as to be consistent. Cal. Health & Safety Code § 123462 (emphasis added).

Finally, the fact that Section 1.1 was enacted in part to protect Californians' right to abortion in response to the United States Supreme Court's reversal of *Roe v. Wade* does not limit the scope of the rights protected, as Lee contends. Mot. 7; *see, e.g.*, Assemb. Comm. on Judiciary, 2021–2022 Reg. Sess., SCA 10 (2022). The California Supreme Court has held that even where the legislature enacts a statute "to address a specific problem," the "particular impetus for the enactment does not limit its scope," and the general language used in the statute must be given effect even if the "lawmakers did not consider the statute's application to the setting at issue." *Los Angeles Sch. Dist. v. Garcia*, 58 Cal.4th 175, 179, 192 (2013) (holding that a statute requiring school district to provide special education services applied to incarcerated individuals).

Lee's narrow interpretation of Section 1.1 finds no support in the case law, legislative history, or common principles of statutory interpretation. Section 1.1 should be read to protect Ms. Jackson's right to freedom in making decisions as to her labor, delivery, and childbirth.

Gibson, Dunn &
Crutcher LLP

11

### 2. Lee Violated Ms. Jackson's Constitutional Reproductive Freedom By Denying Her Right To Make Decisions Related To Childbirth.

Ms. Jackson has alleged that Lee interfered with her rights under Section 1.1 to make intimate decisions about childbirth, including the decisions to give birth in a hospital, seek pain medication, and refuse medical examinations during childbirth. *See* ¶¶ 41–44, 188–93; *supra* Section IV(B)(1), (B)(2).

*First*, Lee, in violation of state law, CDCR's own manuals, and Ms. Jackson's requests, interfered with Ms. Jackson's right and decision to be taken to a hospital to give birth. ¶¶ 90–96. Both California state law and CDCR's Health Care and Operations Manuals dictate that labor "shall be treated as an emergency" and that an inmate in labor shall be immediately transported to an outside hospital for delivery. Cal. Penal Code § 3408(*l*); ¶ 42 (citing CAL. DEP'T OF CORR. & REHAB., HEALTH CARE MANUAL at 3.1.16(e)(5)(A) [providing that labor "shall be treated as an emergency" and that an inmate in labor shall "be transported immediately via ambulance" to an appropriate offsite location for delivery]; *accord* CAL. DEP'T OF CORR. & REHAB., OPERATIONS MANUAL at 54045.6[3]). Lee's refusal to call an ambulance until Ms. Jackson acceded to his demands for an unnecessary and intrusive pelvic examination deprived Ms. Jackson of her right to give birth in a hospital, to receive pain relief, and to be attended to by appropriate medical personnel. *See* Cal. Penal Code § 3408(*l*); ¶ 42 (citing CAL. DEP'T OF CORR. & REHAB., HEALTH CARE MANUAL at 3.1.16(e)(5)(A); *accord* CAL. DEP'T OF CORR. & REHAB., OPERATIONS MANUAL at 54045.6); *see also* ¶¶ 92–100. In doing so, he directly violated Ms. Jackson's right to make intimate decisions about childbirth under Section 1.1. *Carpenter*, 93 Cal.App.5th at 1313 (Section 1.1 protects mother's right to make "decisions about her childbirth").

*Second*, as alluded to above, Lee interfered with Ms. Jackson's reproductive freedoms by forcing her to undergo an unnecessary pelvic examination without her

---

[3] "In the event of an emergency transport for the delivery of a baby, the Supervising Obstetrician, Physician, or RN shall immediately be notified and provide appropriate assistance and/or orders. A pregnant offender in labor shall be treated as an emergency and shall be transported immediately via ambulance."

Gibson, Dunn & Crutcher LLP

informed consent. *See* ¶¶ 94–100. Specifically, Lee forced Ms. Jackson to wait in agony and without pain relief before treating her. *See* ¶ 92. When he finally attended to Ms. Jackson 40 minutes after learning that she was in labor, he refused to call an ambulance and remarked that her labor would have been easier if she had agreed to be induced. *See* ¶¶ 92–93. Knowing Ms. Jackson was in pain and had no access to pain relief, Lee refused to be transport Ms. Jackson to a hospital until after he examined her cervix. *See* ¶¶ 94, 106. To further coerce Ms. Jackson to agree to the examination, he stated that he was in a position to decide which hospital to send her, which would determine how much time she would get with her son after he was born. *See id.* Because of Lee's history of abusing Ms. Jackson (*see supra* at Section II(B)), Ms. Jackson knew that she had no choice. In pain, desperate to get to a hospital, scared for the health of her unborn child, and afraid she would not be allowed much time with her newborn, Ms. Jackson allowed Lee to examine her cervix. *See* ¶¶ 95–96. But, immediately after the exam, Lee admitted he had no say in what hospital Ms. Jackson would be taken to. *See* ¶ 98. Because of Lee's deception and coercion, Ms. Jackson was deprived of her ability to refuse an invasive, humiliating, painful, and unnecessary medical procedure during her childbirth.

**C.     Ms. Jackson Has Alleged A Claim Against Lee For Negligence.**

To state a claim for negligence under California law, a plaintiff must plead that (1) defendant owed plaintiff a duty of care; (2) defendant breached that duty; and (3) the breach caused plaintiff's injury. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). Lee challenges Ms. Jackson's negligence claims—alleged as Count XIII and XV—on two grounds. Lee claims (1) that Ms. Jackson cannot maintain two separate negligence claims based on alternative theories; and (2) that Ms. Jackson has not pled that Lee owed her any duty. Each argument fails.

**1.     Counts XIII And XV Each State Separate Claims For Negligence Arising From Breaches Of Different Duties And Resulting In Separate Injuries.**

Ms. Jackson properly asserts two separate negligence claims against Lee. The first, Count XIII, alleges that Lee was negligent when he prevented Ms. Jackson from

Gibson, Dunn &
Crutcher LLP

13

being transported to an outside hospital for childbirth.  The second, Count XV, alleges that Lee was negligent when he failed to ensure that Ms. Jackson had privacy during childbirth.  Ms. Jackson has adequately pled the necessary elements for each negligence claim.

Lee first argues that Ms. Jackson "improperly split[] a single negligence claim into multiple counts" and that one count must be dismissed on this basis alone.  Mot. 8.  Lee's position makes no sense.  The two negligence claims are two distinct causes of action.  "A 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Gonzales v. California Dep't of Corr.*, 739 F.3d 1226, 1232–33 (9th Cir. 2014) (quoting *Crowley v. Katleman*, 8 Cal.4th 666, 681 (1994)).  Count XIII and XV seek vindication of separate primary rights and allege different duties and different conduct constituting breach.  Specifically, Count XIII implicates Ms. Jackson's right to adequate medical care.  *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 56 (1988) (holding that states and their agents have "an affirmative obligation to provide adequate medical care" to prisoners).  Count XIII asserts that Lee owed Ms. Jackson a duty to treat her labor as an emergency and arrange her transport to an outside hospital to give birth, which he breached by blocking her transportation to the hospital without justification, resulting in her laboring and delivering her son without access to pain relief or proper medical care.  *See infra* Section IV(C)(2)(a); *see also* ¶¶ 90–106, 240–45.  By contrast, Count XV arises from a discrete dereliction of duty pertaining to Ms. Jackson's right to privacy, particularly with regard to her right to avoid public viewing of her naked body.  *See Bowling v. Enomoto*, 514 F.Supp. 201, 203 (N.D. Cal. 1981) (holding that the right to privacy "clearly extends to the naked body" even in a penological setting); *see also In re Long*, 127 Cal.Rptr. 732, 736 (Ct. App. 1976) (recognizing that prisoners retain their "privilege against unwanted exposure of [their] nude body and bodily functions" to the extent possible consistent with institutional security, order, and correctional goals).  Count XV alleges breach of Lee's duty to ensure Ms. Jackson be

Gibson, Dunn & Crutcher LLP

14

given the maximum amount of privacy during labor and delivery. ¶¶ 254–61. Lee breached this duty by causing Ms. Jackson to labor half-naked in a room that was in plain view of correctional staff and inmates passing by. *See infra* Section IV(C)(2)(b); *see also* ¶¶ 89–106. Lee's breach resulted in cognizable injury. *See Romero v. Securus Techs., Inc.*, 216 F.Supp.3d 1078, 1089, 1094 (stating that a plaintiff's alleged loss or damage is sufficient to support a negligence claim where the harm claimed was invasion of privacy). Thus, because Count XIII and XV implicate two distinct duties, plead two separate breaches, and allege distinct injuries, Ms. Jackson has properly pled them as two separate causes of action.

Even if the Court finds that Ms. Jackson's negligence claims are not sufficiently distinct to constitute separate causes of action, separation of distinct theories of a single negligence claim into individual counts is not grounds for dismissal. *See Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 763 (9th Cir. 2015) (allowing quasi contract and common law fraud claims to proceed even when defendant claimed one was "nonsensical because it [i]s duplicative of or superfluous to [Plaintiff's] other claims"); *see also Landeros v. Flood*, 17 Cal.3d 405, 413 (1976) (acknowledging that plaintiffs may assert different negligence theories in separate counts).

### 2. Counts XIII And XV Plead That Lee Owed Ms. Jackson Duties.

Lee next argues that dismissal of Counts XIII and XV is warranted because the statutes cited in the Complaint as evidence of Lee's duty to provide privacy to Ms. Jackson and to arrange her transport to a hospital—Penal Code §§ 4023.8(*l*) and 4023.8(*o*)—apply to county jails and not to state prisons. Mot. 8–9. Defendants' form-over-substance argument fails for many reasons, including because it ignores that there are identical provisions that apply to state prisons, imposing identical duties—which inadvertently were not cited in the complaint. *See* Cal. Penal Code § 3408(*l*), (*o*).

To plead a duty for a negligence claim, a plaintiff may—but is not required to—refer to a statute to identify the source of the duty. *See Landeros*, 17 Cal.3d at 413 (stating that, for negligence, "the statutory basis of liability need not be pleaded at all,

Gibson, Dunn & Crutcher LLP

as the trial court is required to take judicial notice of acts of the Legislature."); *see also Dent v. Nat'l Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020) ("[I]n addition to pleading facts sufficient to support the elements of negligence, a complaint need only support Plaintiffs' theory of the case and ***may*** refer to a statute in doing so.") (emphasis added). Specifically, where a defendant owes a plaintiff a duty under common law, a relevant statute may supply evidence of the specific duty of care owed under the circumstances for purposes of stating a claim for negligence; however, the statute does not create the duty. *See Rosales v. City of Los Angeles*, 82 Cal.App.4th 419, 430 (2000) (the applicable statute does not create a duty of care, but, rather, it serves to define the standard of care owed under the circumstances where there is a viable "underlying claim of ordinary negligence.").

Here, Ms. Jackson has adequately pled a duty in both Counts XIII and XV. Importantly, Ms. Jackson alleged that, because Lee, as her doctor at CIW, occupied a special position of authority and trust with regard to her, he owed her a duty "to use reasonable care to refrain from causing her harm." ¶¶ 240–41, 255–56; *see Lawson v. Superior Ct.*, 180 Cal.App.4th 1372, 1390–91 (holding that due to inmates' vulnerability and dependence on prison staff, prison personnel have a duty to protect inmates from harm); *see also Giraldo v. Dep't of Corr. & Rehab.,* 168 Cal.App.4th 231, 250–51 (2008) (holding that the relationship between a jailer and a prisoner is "the epitome of a special relationship imposing a duty of care on a jailer owed to a prisoner" and highlighting that "the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others"). Ms. Jackson then cited provisions in the Penal Code as additional evidence of the scope of that duty. ¶¶ 243, 258; *see Giraldo*, 168 Cal.App.4th at 250 (citing applicable Penal Code provision and corresponding policy in CDCR Operations Manual as evidence that prison personnel had a common law duty to prisoners and that such duty encompassed the duty to comply with procedures outlined therein intended to protect Plaintiff and other state prisoners from sexual assault). Under Count XIII, she cited Penal Code § 4023.8(*l*), which

Gibson, Dunn &
Crutcher LLP

16

provides that inmates in county jail that are "in labor or presumed to be in labor shall be treated as an emergency and shall be transported to the outside facility." ¶ 243.  Under Count XV, she cited Penal Code § 4023.8(*o*), which provides that inmates in county jail must "be given the maximum level of privacy possible during the labor and delivery process." ¶ 258.

Lee demands the dismissal of Counts XIII and XV solely on the basis that §§ 4023.8 (*l*) and (*o*) do not apply to inmates in state prison.  Lee is wrong for two reasons.  First, Ms. Jackson was not required to plead that Lee violated a statute in order to state a claim for negligence.  *Lawson*, 180 Cal.App.4th at 1390–91 (prison personnel owe duties to prisoners under common law).  Second, even if her negligence claim needed statutory support, Ms. Jackson has stated a claim, because §§ 3408(*l*) and (*o*) of the Penal Code apply to state prisons and are identical in all material respects to §§ 4023.8 (*l*) and (*o*).  *See* Cal. Penal Code § 3408(*l*) (providing that inmates in state prison that are "in labor or presumed to be in labor shall be treated as an emergency and shall be transported to the outside facility"); *id.* § 3408(*o*) (providing that inmates in state prison must "be given the maximum level of privacy possible during the labor and delivery process").  The mere fact that Ms. Jackson did not expressly cite Penal Code §§ 3408(*l*) and (*o*) does not invalidate Ms. Jackson's claims as "the trial court is required to take judicial notice of acts of the Legislature" supporting a plaintiff's claims regardless of whether they are specifically referenced in a complaint.  *See Landeros*, 17 Cal.3d at 413.  Moreover, an "imperfect statement of the legal theory supporting [a] claim" does not warrant dismissal under Rule 8(a)(2).  *See Johnson*, 574 U.S. at 11.[4]

Finally, with the respect to Count XIII only, Lee further argues that § 4023.8(*o*) (and § 3408(*o*)) "specifically addresses the placement of correctional guards during

---

[4] If the Court is inclined to dismiss the negligence claims because Ms. Jackson cited the wrong statute, Plaintiff respectfully requests leave to amend the complaint.  *See Foman v. Davis,* 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."); *Emery v. Warm Springs Rd. CVS, LLC,* 2024 WL 2831351, at *1 (D. Nev. Feb. 23, 2024) (granting leave to amend to include an additional statutory basis for negligence claim.)

Gibson, Dunn & Crutcher LLP

17

labor and delivery" and "does not impose a free-floating duty to provide the 'maximum amount of privacy' in all circumstances." Mot. 9. While the statute provides that corrections officers "be stationed outside the room rather than in the room absent extraordinary circumstances," §§ 4023.8(*o*) (and 3408(*o*)), it is not so limited. Rather, the statute imposes a broad requirement to afford incarcerated pregnant persons with "the maximum level of privacy possible during the labor and delivery process." *Id.* Lee is simply wrong. Accordingly, dismissal of Ms. Jackson's negligence claims on this ground is not warranted.

**V. CONCLUSION**

For the reasons stated above, the Court should deny Lee's Motion.

Gibson, Dunn & Crutcher LLP

DATED: January 20, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Heather Richardson*

Heather Richardson
Jessica Valenzuela
Elizabeth K. McCloskey

*Attorneys for Plaintiff Alexandra Jackson*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Alexandra Jackson, certify that this brief contains **6,401** words, which complies with the word limit of L.R. 11-6.1.

DATED: January 20, 2026        GIBSON, DUNN & CRUTCHER LLP

By: */s/ Heather Richardson*
Heather Richardson
Jessica Valenzuela
Elizabeth K. McCloskey

*Attorneys for Plaintiff Alexandra Jackson*

Gibson, Dunn &
Crutcher LLP

20